LUCILLE C. AYERS AND OTHERS v. F. W. NICHOLS, COMMISSIONER, DEPARTMENT OF EMPLOYMENT SECURITY. E. F. JOHNSON COMPANY, RELATOR.[1]

April 22, 1955.

No. 36,479.

---

[1]Reported in 70 N. W. (2d) 296.

 

*Henry M. Gallagher, C. Donald Peterson,* and *Peterson & Lefler,* for relator.

*William D. Gunn* and *Donald C. Savelkoul,* for claimants-respondents.

*Miles W. Lord,* Attorney General, and *K. D. Stalland,* Assistant Attorney General, for commissioner-respondent.

KNUTSON, JUSTICE.

Certiorari to review a decision of the commissioner of the department of employment security.

The material facts are not seriously in dispute. Employer-relator is a corporation engaged in the manufacture of electrical and electronic equipment at Waseca, Minnesota. At the times material here it employed about 300 production employees and other clerical help. On March 19, 1953, General Drivers, Helpers, and Inside Employees Union, Local No. 487, AFL, was certified by the National Labor Relations Board as the exclusive bargaining representative for the employees of the company. Thereafter collective bargaining took place but failed to reach agreement. On June 11, 1953, an economic strike was called by the union. At the time of the commencement of the strike, 299 production employees were employed. All but ten of these employees participated in the strike the first day. Thirty or forty returned to work by the end of the first week. On June 22, approximately 100 employees were employed. By October 6, 155 strikers had returned, and, in addition, 127 new employees had been employed as permanent replacements for those persons still out on strike. During the course of the strike and between June 18, 1953,

and September 16, 1953, employer issued a number of communications or bulletins to the striking employees encouraging them to return to work, advising them of the employer's plan to put the plant in full production and to fill out the required work force with new personnel, if necessary, and urging that strikers apply for reinstatement while the opportunity still existed. They were also advised that vacation checks were available whether or not the persons were entitled to reinstatement and that group insurance coverage on strike employees was being terminated.

On December 8 an agreement was reached to submit the issues remaining in dispute to arbitration. The picketing of the plant thereupon ceased. The text of the agreement for arbitration reads:

"The labor dispute existing between the above two parties shall be settled by arbitration in accordance with the agreement reached Before Commissioner Charles LaValley in the offices of the Federal Mediation Conciliation Service in Minneapolis on Monday, December 7th, at two p. m.

"Mr. Robert Van Fossen will be the impartial arbiter, and he shall render a decision no later than Wednesday, December 16, 1953. It is agreed by both parties that the decision of the arbiter shall be final and binding on all concerned."

Three issues were submitted to the arbiters, namely, (1) wages, (2) union shop, and (3) whether employees who had been permanently replaced and who had continued on strike should be retained in their employment. Only the last issue mentioned is involved here. The arbitration was requested by the union, the strikers voting in favor of it. The decision of the arbiters was rendered on December 14, 1953, and, as far as material here, reads as follows:

"* * * The issue of reinstatement is the major issue in dispute to be determined.

* * * * *

"It is clear from the evidence presented that the parties have been engaged in an economic strike. It is clear also that the positions left vacant by employees going on strike have been permanently filled,

either by the return of employees to their employment or by the permanent employment of new employees. * * *

"It does not appear that any of the strikers still on strike made any kind of application for return to employment or reinstatement in their former job prior to the hiring of permanent replacements here involved. * * *

"The law as it has developed under the National Labor Relations Act grants no right of reinstatement to economic strikers, particularly if the Employer has hired permanent replacements before the strikers have made unconditional application for reinstatement. The union contention, therefor, is that the arbitrator should apply a different principle. The contention of the Employer, on the other hand, is that such principle is proper for decision in this case. The sole question, of course, is presented as to reinstatement of the striking employees who have not heretofore returned to employment, and under the circumstances of employment now, a decision in their favor would doubtlessly mean the dismissal from employment of persons permanently employed as replacements. No compelling reason is suggested for applying a theory not in consonance with the prevailing law, which is itself a practice in labor relations. While one naturally would be constrained to be sympathetic with employees on strike, it must be remembered that such is a hazard of engaging in a strike, even as loss of income or possible destruction of a business is the hazard encountered by the Employer. One must consider, too, the economic stake of those presently employed. On the facts and in equity, it must be, and is, decided and concluded that all employees who have been on strike and have not as of this date been returned to employment are not entitled to reinstatement, and reinstatement is denied."

No written resignation has been received by the employer from any of the claimants. No claimant has refused employment offered by the employer subsequent to December 8, 1953. About 75 of the strikers have applied for employment subsequent to the arbitration. About 25 have been hired. After the arbitration decision, many of the strikers who had not been employed filed claims for unemploy-

ment benefits. The claims were allowed, and, after the usual administrative appeals, the validity of these claims is here for review by certiorari. It has been agreed that one case be submitted and that the others be decided on the basis of our decision in that case.

Employer contends that claimants are disqualified under M. S. A. 268.09, subd. 1(1), which reads:

"An individual shall be disqualified for benefits:

"(1) If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer or was discharged for misconduct connected with his work or for misconduct which interferes with and adversely affects his employment, if so found by the commissioner, for not less than three nor more than seven weeks of unemployment in addition to and following the waiting period.

"This provision shall not apply to any individual who left his employment to accept work in an industry, occupation or activity in accordance with War Manpower policies of the United States or to accept work offering substantially better conditions of work or substantially higher wages or both, or whose separation from such employment was due to serious illness of such individual."

or § 268.09, subd. 1(6), which reads:

"If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment in which he is or was employed, except that this disqualification shall not act to deny any individual the right to benefits based on employment subsequent to his separation because of a strike or other labor dispute if such an individual has in writing notified the employer involved in such strike or other labor dispute of his resignation and acceptance of his resignation and acceptance of other bona fide employment and provided further that such resignation is accepted by all parties to the strike or other labor dispute so that such individual is not longer considered an employee of such employer. For the purpose of this section the term 'labor dispute' shall have the same defi-

nition as provided in the Minnesota Labor Relations Act. Nothing in this subsection shall be deemed to deny benefits to any employee ·who becomes unemployed because of a lockout or by dismissal during the period of negotiation in any labor dispute and prior to the commencement of a strike."

"Unemployment," under our employment security act, is defined by § 268.04, subd. 23, as follows:

"An individual shall be deemed 'unemployed' in any week during which he performs no service and with respect to which no wages are payable to him, or in any week of less than full time work if the wages payable to him with respect to such week are less than his weekly benefit amount. The commissioner may, in his discretion, prescribe regulations relating to the payment of benefits to such unemployed individuals."

■ While § 268.09, subd. 1(6), adopts the definition of a labor dispute in our Minnesota labor relations act, it does not define a strike or adopt the definition of a strike in our labor relations act. However, it generally is recognized that a strike is a temporary stoppage of work.[2]

■ The general concept of a strike is that employees who go out on strike do not quit their employment, but ordinarily the relationship of employer and employee continues until one or the other of the parties acts to sever the relationship or they mutually act to accomplish that purpose.

■ In our original act, Ex. Sess. L. 1936, c. 2, § 7(d), disqualification due to a labor dispute was based on a work stoppage,[3] and then ·only if the claimant was participating in or financing the labor dispute. Our original act was similar to that adopted by most of the

---

[2]See, Intertown Corp. v. Unemployment Comp. Comm. 328 Mich 363, 43 N. W. (2d) 888; Mark Hopkins, Inc. v. California Employ. Comm. 24 Cal. (2d) 744, 151 P. (2d) 229, 154 A. L. R. 1081; Restatement, Torts, § 797; 40 Wd. & Phr. (Perm. ed.) p. 309; 31 Am. Jur., Labor, § 191.

[3]For a discussion of the term "stoppage of work," see 49 Yale L. J. 483.

states.[4] When we amended the act in 1943 (L. 1943, c. 650, § 5[F]), neither participation[5] nor work stoppage were any longer determinative, but all who were unemployed by virtue of the strike, regardless of whether there was a work stoppage or not, were disqualified during the continuance of the strike. A striking employee, under the express language of § 268.09, subd. 1(6), may sever his relationship with an employer against whom he is on strike and thereafter be entitled to unemployment benefits from another employment. The language of this provision shows that, as far as the employment act is concerned, an employee on strike is considered to still retain the status of an employee as far as he is concerned until he takes action to sever the relationship. We may assume that the employer may take similar action to sever the relationship in an economic strike by permanently replacing the striking employee. We need not fix the exact time at which the severance of the relationship takes place for under our present act the employee is disqualified from receiving benefits as long as the strike continues. It is sufficient to hold that, unless the severance is the result of action taken by the employee, he becomes entitled to benefits when the strike ceases if he then is not reemployed.

Employer here contends that, by agreeing to submit the disputed issues to arbitration and agreeing to abide by the results thereof, claimants agreed to a severance of their employment status and, consequently, are voluntarily unemployed. To support this contention, employer relies on our case of Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449. The fallacy of this reasoning is that in the Honeywell case, by the express terms of their contract, the employees had agreed to a shutdown of the plant which created the unemployment. Similarly, in Johnson v. LaGrange Shoe Corp. 244 Minn. 354, 70 N. W. (2d) 335, the employees, by exercising the rights which they had under their contract to take a vacation in such large numbers as to make it impossible to operate the plant, likewise created the unemployment under and by virtue of their own

[4]See, 49 Yale L. J. 461; 33 Minn. L. Rev. 758.
[5]See, Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 143, 38 N. W. (2d) 223, 231.

382

contract. Here it cannot be said that the discharged employees ever agreed to a severance of their employment status. It is true that they agreed to abide by a determination of their legal rights to have their jobs back, but at that point they already were replaced and had lost their jobs without any consent on their part. By the arbitration they hoped to get their jobs back, not to lose them. Under these circumstances it cannot be said that they voluntarily created the unemployment. It was the act of the employer in refusing to take them back which ultimately created the unemployment. Voluntary unemployment must be held to require some act of the employee at least acquiescing in the unemployment.

Affirmed.

Mr. Justice Frank T. Gallagher took no part in the consideration or decision of this case.