RICE LAKE CREAMERY COMPANY, Respondent, v. INDUS-
TRIAL COMMISSION and others, Appellants.*

*October 31—December 1, 1961.*

* Motion for rehearing denied, with $25 costs, on February 6, 1962.

178

For the appellants there was a brief by *Goldberg, Previant & Cooper* of Milwaukee, for Harry Deboer and others, and

by *Arnold J. Spencer,* chief counsel of the unemployment compensation division, and *Ralph E. Kline* of Madison of counsel, for the Industrial Commission, and oral argument by *Mr. Hugh Hafer* of Milwaukee, and *Mr. Spencer.*

For the respondent there was a brief by *Robertson, Hoebreckx & Davis* of Milwaukee, and oral argument by *O. S. Hoebreckx.*

A brief *amicus curiae* was filed by *Giles F. Clark* of Milwaukee, for the Wisconsin Manufacturers Association.

HALLOWS, J. In *Marathon Electric Mfg. Corp. v. Industrial Comm.* (1955), 269 Wis. 394, 69 N. W. (2d) 573, 70 N. W. (2d) 576, this court held striking employees discharged during a strike were not ineligible to receive unemployment benefits by reason of sec. 108.04 (10), Stats.,[1] stating, at page 407:

". . . when the legislature used the phrase 'lost . . . employment with an employer because of a strike or other *bona fide* labor dispute' in sec. 108.04 (10), Stats., it did not have in contemplation a situation where the relationship of employer and employee was completely terminated, but rather one in which the employee was performing no work for the employer. In other words, what was intended was not the loss of the status of an employee relationship but rather the loss of work."

In the course of the opinion, we stated, at page 408:

"The employer receives the full benefit of the protection of this subsection during the progress of the labor dispute so long as it does not take affirmative action to end the em-

---

[1] "108.04   ELIGIBILITY FOR BENEFITS. . . .

"(10)   *Labor dispute.* An employee who has left (or partially or totally lost) his employment with an employing unit because of a strike or other *bona fide* labor dispute shall not be eligible for benefits from such (or any previous) employer's account for any week in which such strike or other *bona fide* labor dispute is in active progress in the establishment in which he is or was employed."

ployee status of the employee. If it does elect to terminate such status during the progress of the labor dispute the reason for the affording of such protection disappears."

This construction of the statute was reaffirmed in *Marathon Electric Mfg. Corp. v. Industrial Comm.* (1958), 4 Wis. (2d) 162, 89 N. W. (2d) 785, and *Fredricks v. Industrial Comm.* (1958), 4 Wis. (2d) 519, 91 N. W. (2d) 93.

The question presented in this case is whether the employer has taken such affirmative action to end the employee status of the defendants during the progress of the strike as would amount to an election to terminate completely such status for the purpose of applying the Unemployment Compensation Act. If the employer has done so on the facts of this case, then the ineligibility to receive unemployment benefits provided by sec. 108.04 (10), Stats., does not apply to the defendants because their loss of employment was not due to the strike but to the action of the employer in discharging or terminating the employee status of the defendants which continued after the commencement of the strike.

The appellate tribunal found the employer's action in permanently replacing the employees and its notification it would no longer bargain with the union constituted a discharge. We hold that replacing striking employees during the progress of a strike with permanent employees is not in and of itself, as a matter of law, a termination of the employment status or a discharge of the striking employees. Something more on the part of the employer is required. No statutory authority exists in the Unemployment Compensation Act that employees on strike replaced by others on any basis are discharged. Such a result is necessary in the absence of a specific discharge because it is impossible to determine with any certainty until the economic strike is over the identity of those strikers who will offer to return

to work and which of those who offer will not be accepted by the employer. Employment status under the Unemployment Compensation Act is not defined in terms of the specific work which is being done by an employee, but rather, in terms of a status or relationship. See *Marathon Electric Mfg. Corp. v. Industrial Comm., supra.* If the replacing of a striker by a new employee was an automatic discharge of the striking employee, then in this case and in most cases, no one date could be normally determinative of the discharge of all strikers. Here, the record shows replacements were made immediately after the commencement of the strike and continued to December 2, 1958. Furthermore, if replacement were considered a discharge during the strike, the **employer would be forced to finance** the strike to the extent such discharged employees received unemployment benefits and this would be in contravention to the neutrality purpose of the act.

The case of *Knight-Morley Corp. v. Employment Security Comm.* (1958), 352 Mich. 331, 89 N. W. (2d) 541, cited by the appellants, is not a replacement but a discharge case. There, the employer informed the employees if they went out on strike they were fired and replacements would be hired. The next day a letter was sent by the employer to all striking employees stating unless they returned to work on October 5th the employer would consider they had quit their jobs and would replace them. On that date, the employer pulled from the timecard rack their employment cards, the striking employees' names were removed from the company's payroll, and the group life insurance policies and their hospital and surgical insurance plans were canceled. The employer undertook to hire replacements as rapidly as he could secure them. A public announcement in the newspaper was made by the employer, stating the striking employees were no longer employees of the company and those employees seeking to return to work after the given date

would be refused employment. Thereafter, the employer took the position in union negotiations that such negotiations would cover only the employees then on the job and not those on strike. These facts are quite different from the instant case. Neither do we consider *Rainfair, Inc., v. Cobb* (1958), 229 Ark. 37, 312 S. W. (2d) 906, *Ayers v. Nichols* (1955), 244 Minn. 375, 70 N. W. (2d) 296, nor *Greene v. Department of Industrial Relations* (1955), 38 Ala. App. 199, 83 So. (2d) 360, as holding an employer who permanently replaces his striking employees thereby elects to terminate their employee status. While there is some language in those cases indicating such a principle, the cases do not hold the proposition that replacement *per se* terminates the employee status of a striking employee during the strike for unemployment compensation purposes.

This is an economic strike and admittedly the employees have a right to strike, but likewise the employer has a right to attempt to keep his business going by hiring replacements. Nor is it an unfair labor practice to replace striking employees with others in an effort to carry on business. The employer did not under the National Labor Relations Act lose the right to protect and continue his business by hiring replacements and such employer is not bound to discharge the replacements upon the election of the striking employees to resume their employment in order to create places for them. Likewise, the employer can assure those who accept employment during the strike that if they desire, their places will be permanent. *National L. R. Board v. Mackay Radio & Telegraph Co.* (1938), 304 U. S. 333, 58 Sup. Ct. 904, 82 L. Ed. 1381. The rule is stated in *Textile Workers Union of America v. Arista Mills Co.* (4th Cir. 1951), 193 Fed. (2d) 529, 534, as follows:

"The law is well settled that, in case of an economic strike, the employer has a right to continue his business by employing new men for the jobs left by the strikers and

is not bound to discharge them and take strikers in their places when the strike is ended."

See also *Great Southern Trucking Co. v. National L. R. Board* (4th Cir. 1942), 127 Fed. (2d) 180; *Pacific Gamble Robinson Co. v. National L. R. Board* (6th Cir. 1950), 186 Fed. (2d) 106.

In the case of replacement of striking employees with other workers when there is no affirmative action on the part of the employer to discharge any particular striker, it would seem that discharge or termination of the employee status of the strikers for the purpose of unemployment compensation should not and cannot be determined until the active progress of the dispute had ended. Then those striking employees offering to return to work, but not accepted by the employer, become eligible for unemployment benefits on the theory that at that time they are discharged, their employee status terminated and, consequently, their unemployment from actual work or service is then no longer attributable to the strike.

This brings us to the issue of whether the letter of September 10, 1958, and its transmittal to the union constituted affirmative action amounting to a discharge terminating the employer-employee relationship during the course of the strike. The circuit court held there was no credible evidence to support the finding of discharge. We are of the opinion the determination of the Industrial Commission was a conclusion of law not binding on this court and, if the determination is considered to be one of fact, it is not supported by the evidence.

In *Tesch v. Industrial Comm.* (1930), 200 Wis. 616, 621, 229 N. W. 194, the court stated the rule, as suggested in *Weyauwega v. Industrial Comm.* (1923), 180 Wis. 168, 192 N. W. 452, as follows:

" 'Whether a finding is an ultimate fact or conclusion of law depends upon whether it is reached by natural reasoning or by the application of fixed rules of law.' That is, where the ultimate conclusion can be arrived at only by applying a rule of law, the result so reached embodies a conclusion of law and is not a finding of fact."

Citing *Tesch,* Mr. Justice CURRIE in *Gant v. Industrial Comm.* (1953), 263 Wis. 64, 69, 56 N. W. (2d) 525, stated, on behalf of the court, "the adjudication of whether an employer and employee relationship existed is the 'ultimate conclusion as to liability' and therefore constitutes a conclusion of law even though it may have been labeled a finding of fact by the commission."

The evidence requires a conclusion of law that the letter of September 10th was not a discharge within the meaning of the Unemployment Compensation Act; and it does not support a finding of fact of discharge. Ordinarily a discharge of an employee is an unequivocal unilateral act of the employer, leaving no shred of doubt of his intention. Such were the facts in the two *Marathon Cases,* but not here; and resort must be had to the conduct of the employer and the employees prior and subsequent to September 10, 1958, to determine whether the employee status as such was terminated within the meaning of sec. 108.04 (10), Stats.

The conduct of the employee is material in this respect. In *Meyer v. Florida Industrial Comm.* (Fla. 1959), 117 So. (2d) 216, the employer told the employee she was discharged because she joined a strike, but she thereafter refused to consider herself permanently discharged and pursued a claim for reinstatement. The court held there was no discharge and the employee was not entitled to unemployment compensation since her actions were inconsistent with a termination of the employment status.

Here, the employees' action in waiting until December 2d to make an application for unemployment benefits based on an alleged discharge of September 10th is significant. The evidence, however, is best considered in chronological order. The announcement to replace the strikers in order to keep the employer's establishment and business going does not necessarily mean the employer is at some future time going to discharge all the strikers as contended by the employees, but was a notice the employer was going to try to keep its business operating. Replacement is not the equivalent of discharge during an economic strike nor an unfair labor practice under the National Labor Relations Act. The letter of September 10th was explained by the employer's attorney, Mr. Cameron, as being addressed to the union, not the employees, as it dealt solely with the relationship of the employer and the union in regard to the right of the union to continue as a bargaining representative. The last negotiation with the union was on August 27th. He acknowledged the strikers were still employees by stating, "it in fact does not mean that they were not employees. They were striking employees on September 10th."

A copy of the letter was sent to the Wisconsin employment relations board. The question of the union's status as a bargaining representative has not been determined and that issue is not before this court and should not be determined by any implication of this case. The letter of September 10th must be construed in the context of the strike as concerning only the relationship of the employer and the union and the union status as a bargaining representative. It was sent to the union and the Wisconsin employment relations board, not the employees. This apparently was the understanding of the union at that time. The record contains no evidence the union notified the striking employees they were discharged. No claimant testified he thought or considered himself discharged on September

10th. The striking employees did not file an application for unemployment benefits until after the union steward and other claimants applied to return to work on December 2d on an all-or-none basis.

It is true, in the employer's letter of December 3d the term "former employees" was used. This, the employer admits, was technically incorrect. Obviously, the union and the claimants took the same position. They did not recognize the letter of September 10th as a discharge and in the responsive letter of December 20th, prepared by the union and sent by the steward, the offer was "to return to work by all striking employees" and reiterated that "all of the employees, individually and collectively, who were currently on strike, have applied to return to work." This is an inconsistent position. If the claimants were striking employees offering to return to work on an all-or-none basis, they were not discharged on September 10th as they now claim. The employer, in his return of December 6th to the claim of the union steward for unemployment benefits, answered that the applicant had left employment on June 22d because of a labor dispute.

It is contended the trustees' letter of October 9, 1958, to the strikers who were participants in the pension trust, supports the construction that they were discharged on September 10th. This letter referred to the addressees leaving the employ of the creamery on June 22, 1958, the day of the strike. It also stated the pension trust agreement provided that in the event of termination of employment, the trustees were obligated to execute the necessary papers to transfer the insurance policies to the participants. The pension plan is not in the record and we do not know the definition of the term "termination of employment" as used in the plan. From the letter, it would mean termination of service or work, not necessarily status for the purpose of the pension

plan. The reference to June 22d would require such an inference and forbids an interpretation that a discharge took place on September 10th.

We can come to only one conclusion, namely, the employer did not intend by the letter of September 10th to discharge and the letter did not discharge the striking employees within the meaning of the Unemployment Compensation Act.

*By the Court.*—Judgment affirmed.

CURRIE, J. (*concurring*). This is a very close case and one which has caused me considerable difficulty in arriving at a satisfactory conclusion. As the opinion by Mr. Justice HALLOWS points out, discharge is ordinarily a unilateral act on the part of the employer. However, for the purpose of effecting a discharge during the pendency of a strike, so as to subject the employer's account in the unemployment compensation reserve fund to liability to the payment of benefits, it appears unjust to permit an equivocal or ambiguous statement by an employer to be construed as a discharge when not so understood or acted upon by the affected striking employees.

In the instant case, there is no evidence that the employees did interpret the September 10th letter as a discharge. The fact, that they did not file for such benefits until they claim that the employer refused to take the employees back in December, is clearly evidence that at least up to that time they did not understand the September 10th letter to constitute a discharge. The mere fact, that the affected employees continue with strike activities, such as picketing, after the equivocal act of the employer has occurred, is not decisive of the question of whether or not the employees have interpreted the employer's act as a discharge. This is because such strike activities may be carried on for the purpose of forcing the employer to confer employee status again

upon the strikers following a claimed discharge, or they may be carried on under the belief that their original employee status has not been terminated.

For reasons heretofore stated, I would hold that in a case involving an equivocal act of the employer, claimed to constitute a discharge during the progress of a strike, some affirmative bilateral act by the striking employees, indicating acceptance of such act as a discharge, is necessary before the act can be determined to constitute a discharge for the purposes of the Wisconsin Unemployment Compensation Law. In the absence of such a bilateral act by the employees, their employee status continues.

On this reasoning, I concur in affirmance of the judgment below.

FAIRCHILD, J. (*dissenting*). The strike began June 22, 1958. The applicants (individual appellants here) went out on strike. After that the employer eliminated the jobs of two striking employees and replaced the others. There were negotiations until late in August. On September 10th the employer wrote a letter to the union. It is clear that the principal message was the employer's claim that the union did not represent a majority of employees eligible to vote and notice to the union that the employer would not bargain with it unless proof to the contrary were submitted. It is not clear whether the employer was counting the striking employees as if still employees, but the employer did say, ". . . a substantial number of new employees have been hired *on a permanent basis* to replace the striking employees." (Emphasis supplied.) The italicized words made it clear that the striking employees could have no reasonable expectation of being hired to perform their former jobs even if the strike terminated immediately.

The employer had created a pension trust, the terms of which are not in evidence. On October 9th, the trustees

wrote to the applicants that the "pension trust agreement provides that in the event of termination of employment" the trustees shall transfer the policies to the participants and that, "You left the employ of the creamery on June 22, 1958, and you are therefore entitled to receive the insurance policies issued to you under the terms of that agreement." The applicants accepted the policies. The record does not show the definitions of "employment" or "employ" in the agreement.

In December there was an indication that some or all of the applicants desired to return to work and there was an exchange of correspondence. The employer wrote a letter, stating in part, "If any of the *former employees* wish to make application, would you kindly have them do so, . . . and their application will be given consideration when and if jobs for which they are qualified are available." (Emphasis supplied.)

There is no evidence that the employer at any time after September 10th advised the applicants that they were still considered to be employees for any purpose nor that any application for employment by any of them would be treated differently from an application received from a person who had not previously been employed by this employer.

Concededly the picketing of the employer and the dispute continued until the time of the hearing.

The appeal tribunal found, in part, that:

"In this case the employer's action in permanently replacing the employees and its notification that it would no longer bargain with the union of which they were members constituted a discharge of the employees. This action terminated the employee status of the employees and sec. 108.04 (10) of the statutes was not applicable to them after week 37 of 1958.[1]

---

[1] The week in which September 10th fell.

"The appeal tribunal therefore finds that in week 26 of 1958 [when the strike began] the employees left or lost their employment because of a strike or other *bona fide* labor dispute that was in active progress in the establishment in which they were employed, within the meaning of sec. 108.04 (10) of the statutes, but that their unemployment after week 37 of 1958 was not due to such strike or other *bona fide* labor dispute.

"The appeal tribunal further finds that in week 37 of 1958 the employer discharged the employees, but not for misconduct connected with their employment, within the meaning of sec. 108.04 (5) of the statutes and that they are not disqualified from receiving unemployment benefits by sec. 108.04 (10) of the statutes after that week."

The Industrial Commission affirmed the decision of the appeal tribunal.

Sec. 108.04 (10), Stats. 1957, provides:

"An employee who has left (or partially or totally lost) his employment with an employing unit because of a strike or other *bona fide* labor dispute shall not be eligible for benefits from such (or any previous) employer's account for any week in which such strike or other *bona fide* labor dispute is in active progress in the establishment in which he is or was employed."

"Employment" in ch. 108, Stats., means "service . . . performed by an individual for pay." [2]

This court has recognized that an employee status or relationship of employer and employee ordinarily continues to exist after "employment" in the sense of service for pay has ceased because of a strike; that the ineligibility for benefits imposed by sec. 108.04 (10), Stats., applies to those persons retaining an employee status who are out of work due to a *bona fide* labor dispute, but that it ceases to apply

---

[2] Sec. 108.02 (5) (a), Stats.

if the employer elects to terminate the employee status during the progress of the labor dispute.[3]

It must be evident that the letter of September 10th, and the hiring "on a permanent basis" of replacements for applicants, to which the letter refers, either terminated the employee status of applicants or left it a most-tenuous relationship.[4] The later action of the trustees of the pension trust is consistent, so far as the record shows, with a termination of employee status. The reference to applicants in the December letter as "former employees" is consistent only with the proposition that the employee status had ceased. The appeal tribunal and commission were not obliged to accept the explanation that the term was not literally intended.

In my view the evidentiary facts, though undisputed, permit conflicting reasonable inferences to be drawn, and it was for the appeal tribunal and the commission to choose.

"Where undisputed facts permit of different inferences a question of fact and not of law is presented." [5]

"However, when facts are not in dispute but permit the drawing of different inferences therefrom, the drawing of one of such permissible inferences by the commission is an act of fact finding, and the inference so derived constitutes a finding of an ultimate fact and not a conclusion of law." [6]

---

[3] *Marathon Electric Mfg. Corp. v. Industrial Comm.* (1955), 269 Wis. 394, 407, 408, 69 N. W. (2d) 573, 70 N. W. (2d) 576.

[4] It has been suggested that permanent replacement of a striking employee may sever the employer-employee relationship. *Greene v. Department of Industrial Relations* (1955), 38 Ala. App. 199, 83 So. (2d) 360; *Ayers v. Nichols* (1955), 244 Minn. 375, 381, 70 N. W. (2d) 296, 299.

[5] *Eckhardt v. Industrial Comm.* (1943), 242 Wis. 325, 329, 7 N. W. (2d) 841.

[6] *Gant v. Industrial Comm.* (1953), 263 Wis. 64, 69, 56 N. W. (2d) 525.

I would reverse the judgment and direct affirmance of the decision of the commission.

I am authorized to state that Mr. Justice BROWN and Mr. Justice DIETERICH join in this opinion.