PLYMOUTH STAMPING, DIVISION OF ELTEC CORPORATION v
LIPSHU

Docket No. 95816. Submitted January 20, 1988, at Detroit. Decided
April 18, 1988. Leave to appeal applied for.

Mike Lipshu, Jr. and several other employees of Plymouth
Stamping, Division of Eltec Corporation, all of whom were
members of one labor union, went on strike against Plymouth
Stamping when negotiations failed to produce an extension or
renewal of an expired collective bargaining agreement. Plym-
outh Stamping subsequently sent a letter to each striking
employee informing them that replacement workers hired to
fill their positions would be retained permanently. Claims for
unemployment benefits filed by the striking employees were
initially denied by the Michigan Employment Security Commis-
sion on the basis of the labor dispute disqualification from
unemployment benefits. However, following a hearing, an MESC
referee ruled that the striking employees, upon receiving Plym-
outh Stamping's letter, ceased to be disqualified from benefits
under the labor dispute disqualification since the letter effec-
tively terminated their employment. The MESC Board of Re-
view and the Wayne Circuit Court, William L. Cahalan, J.,
affirmed the referee's decision on appeal. Plymouth Stamping
appealed.

The Court of Appeals *held:*

Under MCL 421.29(8); MSA 17.531(8) striking employees are
disqualified from receiving unemployment benefits during the
strike even if the employer hires replacement workers. How-
ever, this disqualification ends when and if the employer an-
nounces that the replacement workers will be retained perma-
nently.

Affirmed.

REFERENCES

Am Jur 2d, Unemployment Compensation §§ 8, 78 *et seq.*, 94.

Comment Note.—General principles pertaining to statutory disqual-
ification for unemployment compensation benefits because of
strike or labor dispute. 63 ALR3d 88.

See also the annotations in the Index to Annotations under Unem-
ployment Compensation.

1. UNEMPLOYMENT COMPENSATION — APPEAL — SCOPE OF REVIEW.

   The Court of Appeals may reverse a decision by a referee of the Michigan Employment Security Commission or the commission's board of review only if the decision is contrary to law or not supported by competent, material and substantial evidence on the whole record (MCL 421.38[1]; MSA 17.540[1]).

2. UNEMPLOYMENT COMPENSATION — APPEAL — MATTERS OF LAW.

   Questions presented to the Court of Appeals on appeal from a decision of the Michigan Employment Security Commission are to be treated as matters of law where there is no dispute as to the underlying facts.

3. UNEMPLOYMENT COMPENSATION — LABOR DISPUTE DISQUALIFICATION.

   Employees on strike against their employer are disqualified from receiving unemployment benefits during the strike even if the employer hires others to replace the striking employees; however, this disqualification ends if and when the employer announces that the replacement workers will be retained permanently (MCL 421.29[8]; MSA 17.531[8]).

*Fitzgerald, Hodgman, Cox, Cawthorne & McMahon* (by *William L. Hooth* and *John L. Cerretani),* for petitioners.

*Rothe, Mazey, Mazey & Hamburger* (by *William Mazey),* for respondents.

Before: D. E. HOLBROOK, JR., P.J., and H. HOOD and N. J. KAUFMAN,* JJ.

H. HOOD, J. Employer Plymouth Stamping appeals as of right from the order of the Wayne Circuit Court which affirmed the Michigan Employment Security Commission Board of Review's determination that claimants were not disqualified from receiving unemployment benefits after January 17, 1981.

The facts are undisputed. Claimants are produc-

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

tion employees of Plymouth Stamping. Claimants are members of and represented by Local 985 of the UAW. The union's contract with Plymouth was to expire September 1, 1980, and Plymouth and the union began to negotiate a new contract in August, 1980. Claimants agreed to work for one week after the September 1, 1980, deadline without a contract. When the parties failed to come to an agreement, claimants, through the union, went on strike. When the strike first started, Plymouth had management personnel and their families do the work of the striking employees. In October, 1980, however, Plymouth began to hire replacements. At first, Plymouth told the replacements that, if the strike was settled, they would have to leave.

The parties negotiated two or three times in each of the months of September through December, 1980, and once in each month thereafter until April, 1981. After that, negotiation sessions became more sporadic.

On January 15, 1981, Plymouth told claimants and the union that the replacements would be kept on permanently and that in event of a settlement claimants could get their jobs back only as openings became available. This condition was formally submitted to the union in the March 12, 1981, proposal. At that time, there were seven openings. The union refused to accept this condition, taking the position that claimants would return to work only if all the replacements were fired.

Thereafter, claimants filed for unemployment benefits with the MESC. The MESC initially denied benefits on the grounds that claimants were disqualified pursuant to the labor dispute disqualification provision of the Michigan Employment Security Act, MCL 421.29(8); MSA 17.531(8), because

their unemployment resulted from a labor dispute. This statute states in part:

> An individual shall be disqualified for [unemployment] benefits for a week in which the individual's total or partial unemployment is due to a labor dispute in active progress. . . .

Claimants appealed this decision to a referee. A hearing was held, and on June 22, 1982, the referee modified the initial determination, finding that claimants were not disqualified from receiving benefits after January 17, 1981. The referee found that on January 15, 1981, Plymouth notified claimants that they were permanently replaced and that this constituted a termination of claimants' employment. The referee held that claimants were not thereafter disqualified pursuant to the labor dispute provision.

Following an appeal by Plymouth, the MESC Board of Review affirmed the referee's decision on January 31, 1985.

Plymouth appealed to the Wayne Circuit Court. The court issued its opinion affirming the board of review and Plymouth appeals as of right.

This Court may reverse an MESC referee and the board of review only if their decision is contrary to law or not supported by competent, material, and substantial evidence on the whole record. MCL 421.38(1); MSA 17.540(1); *Chrysler Corp v Sellers,* 105 Mich App 715, 720; 307 NW2d 708 (1981). If there is no dispute as to the underlying facts, questions presented on appeal are to be treated as matters of law. *Chrysler Corp, supra,* p 720.

The labor dispute disqualification provision is intended to advance the legislative policy that the state remain neutral in labor disputes. *Intertown Corp v Unemployment Compensation Comm,* 328

Mich 363, 366; 43 NW2d 888 (1950); *Linski v Employment Security Comm,* 358 Mich 239, 244; 99 NW2d 582 (1959).

Our review of the record reveals that the referee's findings of fact are all supported by competent, material, and substantial evidence on the record. Thus, the question is whether the referee's decision that, upon being permanently replaced, claimants were terminated and no longer disqualified from receiving unemployment benefits is contrary to law. The referee relied on two Michigan Supreme Court decisions which Plymouth claims are distinguishable.

The first case relied upon by the referee is *Intertown, supra.* In *Intertown,* the two claimants, employees of Intertown Corporation, were involved in a strike which began on October 26, 1948. New employees were hired, and there was no work stoppage after the first week. The claimants received their pay checks the following week along with a letter which they interpreted as a termination of their employment. *Intertown, supra,* pp 364-365. The claimants continued to picket the corporation until December 14, 1948, when the dispute ended. Both of the claimants got different jobs after that but, when laid off, filed for unemployment benefits. The referee determined that the claimants were not disqualified under the provision providing for disqualification if an employee left work voluntarily without good cause attributable to his employer. In affirming, the Court stated:

> This Court need not characterize the "fault" in the strike. Unemployment compensation does not depend upon the merits of a labor dispute. Claimants here did not quit their job; they went out on strike. Although on strike they were still employ-

ees. *They remained employees until discharged by
the corporation during the second week of the
strike.* [*Intertown, supra,* pp 366-367. Citations
omitted, emphasis added.]

While *Intertown* is instructive in that the Court
felt that the letter was notice of termination, it is
not exactly on point. First of all, the disqualifica-
tion provision at issue was the disqualification for
leaving work voluntarily without good cause at-
tributable to the employer, not the labor dispute
provision. Second, the claimants were not seeking
benefits for the period they were on strike, but
were seeking benefits for the time they were laid
off from the jobs they got after termination from
Intertown.

The second case relied upon by the referee is
*Knight-Morley Corp v Employment Security
Comm,* 352 Mich 331; 89 NW2d 541 (1958). In
*Knight-Morley,* the claimants went on strike on
September 30, 1953. The employer told some of the
employees as they went out on strike that, if they
did so, they were fired and replacements would be
hired. On October 1, the employer sent all the
employees a letter stating that, unless they re-
ported for work on October 5, the employer would
consider that they had quit and would replace
them. None of the employees told the employer
that they were quitting. On October 5, the em-
ployer took the following action against the em-
ployees who had not reported: pulled their employ-
ment cards from the rack, removed them from the
company payroll, cancelled their life, hospital, and
surgical insurance policies, and refused the union's
request to maintain the insurance coverage by a
letter which referred to them as "former employ-
ees" and to "terminated employment." In addition,
the employer hired replacements and printed an

open letter in the newspaper which stated that the strikers were no longer employees of the company. On October 10, at a bargaining session, the employer took the position that negotiations would cover only employees then on the job, and not those who had not returned by October 5. The employer took back only those workers who returned by October 5. Those who did not return were replaced by new employees as rapidly as the employer could secure qualified replacements. *Knight-Morley, supra,* p 333. The referee, appeal board, and circuit court all agreed with the MESC's initial determination that the labor dispute disqualification had ended on October 5, the date the strikers were terminated by the employer. *Id.,* p 332. Conceding the differences between *Intertown* and *Knight-Morley,* the Court nevertheless held that the *Intertown* rationale applied and that the employer actually discharged the employees as of October 5, and that the labor dispute disqualification ended then. *Id.,* pp 335-336.

Plymouth attaches to its brief on appeal an unpublished opinion of this Court, *Trombley v St Francis Hospital,* decided September 20, 1983 (Docket No. 64505), in which this Court held, under facts similar to those in the instant case, that the claimants were disqualified. In *Trombley,* the claimants, hospital employees, struck the hospital. The hospital sent the strikers letters saying that permanent replacements would be hired. One by one as the claimants were replaced, they received letters informing them they were being permanently replaced. This Court affirmed the circuit court order holding that claimants were disqualified under the labor dispute disqualification provision. This Court's reasoning was very brief:

The decision of the circuit court is affirmed. .

Our review of the record indicates that the finding that a labor dispute was a substantial contributing cause of unemployment for all claimants is well supported. See *Smith v Employment Security Comm, supra,* pp 256-258.

Although we decline to fashion a per se rule that a permanent replacement letter, by itself, can never constitute a discharge, in the instant case, the record can not support a factual finding that those employees who received a permanent replacement letter were discharged as of the date of the letter. See *Knight-Morley Corp v Employment Security Comm,* 352 Mich 331; 89 NW2d 541 (1958).

Judge CYNAR dissented, finding that a letter of notice of termination was a discharge and that the labor dispute disqualification ended then. We note that an unpublished opinion is not precedentially binding under MCR 7.215(C), and we would not normally discuss the case at all. However, the fact that this Court cited *Knight-Morley* indicates it felt that *Trombley* was distinguishable from *Knight-Morley* in that the *Trombley* employer did not do all the things the *Knight-Morley* employer did, such as pull timecards, publish an open letter in the newspaper referring to the strikers as "former employees," etc.

The view that the actions taken by the employer determine whether the striking employees are discharged and thus not disqualified was also taken in the Wisconsin case of *Rice Lake Creamery Co v Industrial Comm,* 15 Wis 2d 177; 112 NW2d 202 (1962). In *Rice Lake,* the employees of the creamery struck on June 22, 1958. The day before the strike, the employer posted a notice of its intention to operate the plant regardless of a strike and that employees not reporting for work would be replaced and the replacements would

have tenure over the striking employees. *Id.,* p 179. The court held that the letter alone was not a discharge or a termination of the strikers' status as employees. The court stated:

> The appellate tribunal found the employer's action in permanently replacing the employees and its notification it would no longer bargain with the union constituted a discharge. We hold that replacing striking employees during the progress of a strike with permanent employees is not in and of itself, as a matter of law, a termination of the employment status or a discharge of the striking employees. Something more on the part of the employer is required. No statutory authority exists in the Unemployment Compensation Act that employees on strike replaced by others on any basis are discharged. Such a result is necessary in the absence of a specific discharge because it is impossible to determine with any certainty until the economic strike is over the identity of those strikers who will offer to return to work and which of those who offer will not be accepted by the employer. Employment status under the Unemployment Compensation Act is not defined in terms of the specific work which is being done by an employee, but rather, in terms of a status or relationship, See *Marathon Electric Mfg Corp v Industrial Comm* [269 Wis 394; 69 NW2d 573]. If the replacing of a striker by a new employee was an automatic discharge of the striking employee, then in this case and in most cases, no one date could be normally determinative of the discharge of all strikers. Here, the record shows replacements were made immediately after the commencement of the strike and continued to December 2, 1958. Furthermore, if replacement were considered a discharge during the strike, the employer would be forced to finance the strike to the extent such discharged employees received unemployment benefits and this would be in contravention to the neutrality purpose of the act. [15 Wis 2d 183-184.]

The court distinguished *Knight-Morley*, stating that the employer in *Knight-Morley* took many more actions inconsistent with maintaining the strikers' status as employees. *Id.,* p 184.

The same reasoning was used in *Building Products Co v Arizona Dep't of Economic Security,* 124 Ariz 437; 604 P2d 1148 (1980).

Although *Rice Lake* and *Building Products* are not in favor of claimants' position in the instant case, there are decisions from other jurisdiction which would support claimants' position. In *Ruberoid Co v California Unemployment Ins Appeals Bd,* 59 Cal 2d 73; 27 Cal Rptr 878; 378 P2d 102 (1963), after employees struck, the employer sent them a letter stating that all employees who did not return to work by a certain date would be permanently replaced. The employer later mailed to all employees still on strike a notice that they had been permanently replaced and enclosed a check for their pro rata vacation pay to the date of the strike. *Id.,* p 75. The California Supreme Court held that the labor dispute disqualification provision rests upon a two-part test: 1) the worker must voluntarily leave and remain away from his employment, and 2) the worker must leave or stay away because of a trade dispute. 59 Cal 2d 77. The court called the two tests a volitional test and a causation test, respectively. The court held that neither test was met. The court found that employees could not voluntarily remain away from a job that no longer existed. *Id.,* p 79. The court also held that the labor dispute did not cause the unemployment because the replacement of the strikers removed the labor dispute as the cause of the strikers' unemployment. The Court held that, while the labor dispute directly caused the initial unemployment, the disqualification on that basis ended when the employer permanently replaced

the strikers. *Id.,* p 80. Thus, the claimants were not disqualified. *Id.,* p 82.

In *Baugh v United Telephone Co of Ohio,* 54 Ohio St 2d 419; 377 NE2d 766 (1978), the employer sent striking employees a letter stating that, if they did not return to work by June 1, the employer would start hiring replacements and, if at the end of the strike a replacement worker occupied the striker's former job, the striker had no job. 54 Ohio St 2d 420. A second letter was sent on June 1, informing the employees that their positions had been filled. *Id.* The court held that the only conclusion that could be drawn was that the employer's severance of the employees' status was the proximate cause of the claimants' unemployment and held that the claimants were not disqualified. *Id.,* p 425. The Court cited *Knight-Morley, supra.*

Viewed from the employer's perspective, claimants' unemployment arguably is still "due to" the labor dispute since if there was no labor dispute, claimants would not now be unemployed. Disqualification would advance the policy that the state remain neutral in labor disputes. The parties were still far apart on other issues such as insurance. Thus, there is still a labor dispute which is still being negotiated. Plymouth also argues that, if claimants are not disqualified, Plymouth would in effect be financing a strike against it by its own employees.

From the claimants' perspective, it seems inequitable for them not to be entitled to unemployment benefits. Plymouth may have hired the replacement workers at minimum wage, and that may arguably be the reason why Plymouth wants to keep the replacements permanently. The fact that Plymouth has replacements could keep Plymouth from bargaining in good faith.

Although a close case, we believe that the referee's decision was correct and not contrary to law. Because there are cases which hold that permanent replacement is equivalent to termination of employee status and that the labor dispute disqualification ends when the claimant is permanently replaced, the referee's decision can not be said to be contrary to law.

The only Michigan case which says that a court must look at all the actions the employer takes is *Trombley,* an unpublished case which has no precedential value. We also believe Judge CYNAR's view in *Trombley* that a letter notifying a striking employee that he is permanently replaced amounts to a discharge is the better view. Since there is no Michigan case having precedential value which says that a situation like the instant case should be distinguished from *Knight-Morley,* we believe that *Knight-Morley* should be followed. Although strikers should be disqualified from receiving benefits during a strike even if the employer hires replacements, the disqualification should end when. and if the employer announces that the replacements will be kept permanently.

Because the referee's decision is not contrary to law and his findings are supported by competent, material, and substantial evidence, the decision of the circuit court is affirmed.

Affirmed.