STANLEY R. JOHNSON AND OTHERS v. WILSON & COMPANY, ALSO KNOWN AS WILSON & COMPANY, INC. FRANK T. STARKEY, COMMISSIONER, DEPARTMENT OF EMPLOYMENT SECURITY, RESPONDENT.

124 N. W. (2d) 496.

October 18, 1963—Nos. 38,786, 38,787.

*Hall, Smith, Hedlund, Juster, Forsberg & Merlin,* for claimants-relators.

*Meighen, Sturtz, Peterson & Butler* and *M. Lee Bishop,* for employer-relator.

*Walter F. Mondale,* Attorney General, and *Joseph A. Coduti,* Assistant Attorney General, for respondent commissioner.

SHERAN, JUSTICE.

Certiorari to review a decision of the Department of Employment Security awarding and denying unemployment compensation benefits. This review involves all but 2 of 562 claims for benefits on account of unemployment arising initially out of a strike or labor dispute at the Albert Lea plant of employer-relator, Wilson & Company, Inc., hereinafter referred to as employer.

Employer is a corporation with its main offices in Chicago, Illinois. It operates meat packing plants at Albert Lea, Minnesota, and elsewhere. At Albert Lea it employs approximately 1,050 production and maintenance employees represented by the United Packinghouse Workers of America, AFL-CIO, Local No. 6, commonly referred to as Local 6, UPWA, hereinafter called the union. The employer and the union had a collective bargaining contract, which was terminated by notice from the union to the employer on September 19, 1959. Negotiations for a new contract had been carried on from July 1959 until the latter part of October 1959. On October 29, a labor dispute developed at the Albert Lea plant of the employer.[1] An official strike

---

[1] One employee in the sausage department of employer's plant was suspended for a refusal to work overtime on October 26, 1959. A large number of employees walked out in protest and they were also suspended. The suspensions were lifted in an effort to clear the air for amicable settlement. However, in order to prevent spoilage of a large volume of meat products

was declared by the union on November 3. At different times thereafter all of the claimants involved herein filed claims for unemployment benefits. It was initially determined that these claimants were disqualified from receiving benefits on the theory that unemployment was caused by a strike or labor dispute.[2] On February 26, 1960, a claims deputy of the Department of Employment Security ruled that the labor dispute ended at the plant of the employer on February 19, 1960, and that the claimants were no longer disqualified under Minn. St. 268.09. After de novo proceedings before an appeal tribunal these determinations were affirmed.

The appeal tribunal made the following findings of fact:

"On November 4, 1959, the company commenced a program of inducing the employees on strike to return to work. On that date it issued news releases for publication in newspapers and broadcasts by radio, which releases were published in all local newspapers and broadcast by radio in Albert Lea and the vicinity, urging employees on strike to return to work and announcing that employees who returned to work would not be required to sign assurance statements. * * * On November 8, 1959, the company put into effect a personal contact program at all of its plants, including the one at Albert Lea, pursuant to which management and office employees contacted employees on strike in person and by telephone, urging them to return to work. On October 30, November 25 and December 5, 1959, and on several occasions thereafter up to the time of termination of the strike, the office of the vice president of the company prepared and mailed letters to all production and maintenance workers on strike, urging them to return to work. These letters were sent out over the signature of the vice

---

on hand, the employer during the forenoon of October 29, 1959, ordered the employees of the bacon department to work overtime. By afternoon most of the employees in all of the major production departments refused to work and went on strike.

[2] Minn. St. 268.09, subd. 1(6), provides that an individual shall be disqualified for benefits if such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute.

president. This entire program of inducing the striking employees to return to work continued throughout November and December, 1959. * * * During the entire period of the strike, the striking employees' names were carried on the company's payrolls as being on strike. At no time during the period of the strike were striking employees foreclosed from returning to work.

"On or about November 30, 1959, the company commenced hiring new employees in order to operate the plant so as to retain its customers.

\* \* \* \* \*

"A series of negotiation meetings called by the U. S. Conciliation Service were held on December 17, 18, 19 and 21, 1959. However, no agreement was reached and on December 21, 1959, the meeting was adjourned for an indefinite period.

"The next series of negotiation meetings called by the U. S. Conciliation Service were held on January 11, 12, 13, 14 and 15, 1960. No agreement was reached.

\* \* \* \* \*

"By February 16, 1960, the company had in its employ about 900 new and 25 old production workers.

"On or about February 12, 1960, the company representatives and the union representatives agreed to submit certain disputed matters to a three-member Arbitration Board for determination, which consisted of reinstatement of employees who were on strike, employees who had been suspended or discharged during the period of the strike and the order in which such employees should be recalled to work in the event agreement as to the contents of a new labor contract was reached.

"On February 16, 1960, a new collective bargaining agreement was entered into by representatives of the company and representatives of the United Packinghouse Workers of America, AFL-CIO, subject to ratification of the said union membership. On February 19, 1960, the membership of United Packinghouse Workers of America, AFL-CIO, ratified the said collective bargaining agreement and it became effective immediately. * * * Although this agreement is labeled Interim Agree-

ment, there had been no changes or amendments made to said contract at the time of hearing herein and both the company and the union have been operating under said contract since February 19, 1960. Attached to said agreement and made a part thereof, are three supplemental agreements which were entered into on February 16, 1960, and ratified on February 19, 1960, designated as Agreement A, Arbitration Agreement B, Addendum and an agreement relating to coverage of employees for Diagnostic Insurance. Agreement A provides, among other things as follows:

" 'As part of the settlement of the strike, the parties agree as follows:

\*     \*     \*     \*     \*

" '2. Individuals who have been notified by the company of discharge or other disciplinary action by reason of misconduct \* \* \* shall have the right to present their cases in arbitration \* \* \*. The reinstatement rights of all other employees shall be governed by paragraph 7 below.

\*     \*     \*     \*     \*

" '4. The union will announce by release to the press, by letter to its local unions and by letters to the AFL-CIO and to International and National unions affiliated with AFL-CIO *that the strike has been settled* and that this union is no longer requesting the public to refrain from buying Wilson & Co. products. \* \* \*

\*     \*     \*     \*     \*

" '7. Commencing February 23, 1960, all striking employees shall be returned to work in accordance with the seniority and recall provisions of the Interim Agreement executed simultaneously herewith, to the extent that jobs are available, with all their previous rights of seniority and continuous service except that the rights of employees accused of having engaged in unlawful or unprotected activities after November 3, 1959, and the rights of employees for whom jobs do not become available within two full calendar weeks after February 22, 1960, shall be determined in accordance with the arbitration agreement executed simultaneously herewith.'

\*     \*     \*     \*     \*

"The labor dispute and strike terminated on February 19, 1960, and on Monday, February 23, 1960, the company commenced recalling the employees who had been on strike back to work, and by March 14, 1960, 950 of said employees had been recalled, processed and returned to work. Thereafter, additional eligible striking employees were recalled and returned to work as soon as it was feasible to do so. All recalls of employees to return to work were made in accordance to seniority. After several meetings, the Arbitration Board ordered reinstatement of all but six of the striking production workers who had been charged with the commission of unlawful or unprotected activities during the period of the strike."

The tribunal could also have found that the employer on November 25, 1959, in a letter addressed to "All Production and Maintenance Employes," advised them that *unless you return to work by Monday, November 30, you run the risk of being replaced*"; that in a letter dated December 5, 1959, the striking employees were advised that "[m]any of the strikers have now been replaced by new employes" and warned "that each day that you fail to return to work increases the chances that a new employe will have replaced you." By press releases, announcements, and other letters, the employer admonished that the striking employees would be replaced. On December 9, 1959, in one such news release, it stated:

"In order to avoid any misunderstanding as to the company position as a result of a mistake [sic] quote from the testimony of Mr. Cairns, Wilson Albert Lea Plant Manager, we wish to re-emphasize that permanent replacements for strikers have been and are being hired. *To date no individual striker has been notified specifically that he is replaced, but this does not alter the fact that each new employee hired replaces a striker in his job.*

"Replaced strikers lose all rights to any job with Wilson & Co." (Italics supplied.)

By December 11, 1959, the employer had succeeded in its campaign to acquire a work force to the extent it had then on its payroll 814 replacements. On February 16, 1960, it had 900 "new hires"

and 25 old employees and was operating with approximately 95 percent of the normal work force. The record shows also that on February 19, 1960, when the so-called "Interim Agreement" was ratified and put into effect, 884 "new hires" were performing the work of 733 striking employees and to that extent, at least, the 733 striking employees had been replaced. The employer's position before final settlement was that employees hired during the course of the strike in order to keep production flowing had the status of permanent employees. After ratification of the Interim Agreement on February 19, 1960, striking employees returned to the job on an "as needed" basis pending arbitration of the employment priority status of the strikers and "new hires." From February 23 to March 9, 193 out of the 733 employees on strike returned to work. The decision of the Arbitration Board, issued March 10, 1960, provided in part—

"\* \* \* that all employees including both those in the employ of the Company immediately prior to the strike and those who were hired thereafter and were in its employ at the end of the strike shall be assigned to jobs without discrimination, in accordance with their seniority rights as determined by the rules which have been operative for a number of years before the strike started and which remained unchanged during the strike."

The effect of the board's order was to give job priority to the strikers. On March 14, 1960, nearly all of the striking employees were back at work. The remainder (excepting only employees charged with acts of misconduct then subject to arbitration) were returned to work before March 28, 1960.

The numerous letters, news releases, and announcements to the effect that striking employees would be or were replaced were motivated, according to M. R. Swanson, the employer's industrial relations manager throughout the strike period, by a two-fold objective: (1) To discourage acts of violence,[3] and (2) to convince employees that it was

---

[3]The appeal tribunal found: "On or about December 8, 1959, violence broke out both within and outside of the picket lines at the Albert Lea plant, and on or about December 11, 1959, the Governor of the State of

to their advantage to return to work. With the exception of a few charged with misconduct, all striking employees were carried on the company payroll as being on strike. The employer's group insurance policy covered only employees of Wilson & Company and no coverage was canceled during the dispute. Apart from the general announcements, no specific action was taken by the employer to terminate the status of any particular employee. From the commencement of the strike to February 19, 1960, no striking employee applying for work was refused employment at the Albert Lea plant.

After considering the facts, the appeal tribunal concluded:

"Decision: It is Considered and Determined That the claimants lost their employment on October 29, 1959 because of a strike resulting from a labor dispute at the employer's establishment where they were employed; that said labor dispute and strike was in progress from October 29, 1959 to February 19, 1960; and that the claimants herein are disqualified for benefits for the duration of said period of October 29, 1959 to February 19, 1960, inclusive."

The commissioner of the Department of Employment Security affirmed this determination, adopting the findings of the appeal tribunal.

■ This review raises questions as to the validity of certain findings of the department and the failure to make other factual determinations. Both sides argue that its decision is contrary to law.

In proceedings of this nature our scope of review is limited to a consideration of whether the department kept within its jurisdiction; whether it proceeded on an erroneous theory of law; whether its action was so arbitrary and unreasonable that it represents its will and not its judgment; or whether the decision of the department is without evidence to support it. State ex rel. Duluth Clearing House Assn. v. Dept. of Commerce, 245 Minn. 529, 73 N. W. (2d) 790.

■ Claimants dispute the finding of the appeal tribunal that the

---

Minnesota called out the Minnesota National Guard to quell the disturbances and temporarily closed the plant which was reopened on or about December 28, 1959, pursuant to an order issued by the U. S. District Court." For detail in this regard, see Wilson & Co. v. Freeman (D. Minn.) 179 F. Supp. 520.

employer instituted a program of inducing the strikers to return to work. They claim the following findings should have been made: (1) That the employer replaced strikers with "new hires"; and (2) that (a) the employer's December proposal of a preferential list without seniority;[4] (b) the December 9, 1959, news release (claimants' exhibit 29); (c) the employer's position throughout that "new hires" were permanent replacements; (d) the notice of January 25, 1960, (employer's exhibit R) to all striking employees that those guilty of misconduct or those permanently replaced would no longer be eligible for continuance of group insurance coverage; (e) the position of the employer shown by the Interim Agreement (employer's exhibit J); and (f) the position of the employer before the Arbitration Board established termination of the employee status. Claimants also argue that the appeal tribunal adopted an erroneous rule of law when it treated the employees' case as one claiming existence of a lockout in November and December 1959.

The basic issue of claimants' case is whether the evidence supports or requires a finding that the employer at some time before February 19, 1960, terminated the employee status of claimants, who thereupon, ceasing to be voluntarily unemployed because of a labor dispute, would no longer be ineligible for unemployment benefits under Minn. St. 268.09, subd. 1(6), providing that an individual shall be disqualified for benefits:

"If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such

---

[4]Paragraph 7 of an agreement entered into simultaneously with the Interim Agreement reads as follows: "Commencing February 23, 1960, all striking employees shall be returned to work in accordance with the seniority and recall provisions of the Interim Agreement executed simultaneously herewith, to the extent that jobs are available, with all their previous rights of seniority and continuous service except that the rights of employees accused of having engaged in unlawful or unprotected activities after November 3, 1959, and the rights of employees for whom jobs do not become available within two full calendar weeks after February 22, 1960, shall be determined in accordance with the arbitration agreement executed simultaneously herewith."

disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment in which he is *or was employed,* * * *. For the purpose of this section the term 'labor dispute' shall have the same definition as provided in the Minnesota Labor Relations Act.[5] Nothing in this subsection shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout or by dismissal during the period of negotiation in any labor dispute *and prior to the commencement* of a strike." (Italics supplied.)

While we are bound by the findings of fact and the reasonable conclusions of fact made by the administrative tribunal, we agree with claimants that here the determination of whether claimants were discharged is a conclusion of law not binding on this court. Rice Lake Creamery Co. v. Industrial Comm. 15 Wis. (2d) 177, 112 N. W. (2d) 202; Almada v. Administrator, 137 Conn. 380, 77 A. (2d) 765.

There are two types of statutes dealing with disqualification for unemployment benefits because of claimant's involvement in a labor dispute: (a) The so-called "Wisconsin" or "active progress" type of statute[6] in which the worker is disqualified only if a strike or other labor dispute is in active progress, and (b) the "work stoppage" statutes[7] where the worker is disqualified unless the unemployment for

---

[5]Minn. St. 179.01, subd. 7, provides: " 'Labor dispute' includes any controversy concerning employment, tenure or conditions or terms of employment or concerning the association or right of representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms, tenure, or other conditions of employment, regardless of whether or not the relationship of employer and employee exists as to the disputants." It is not seriously contended by either claimants or employer that a labor dispute as herein defined did not exist at the Albert Lea plant of Wilson & Company between October 29, 1959, and February 19, 1960.

[6]Wis. Stat. 1961, § 108.04(10), provides: "An employe who has left (or partially or totally lost) his employment with an employing unit because of a strike or other bona fide labor dispute shall not be eligible for benefits * * * for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed." Note similarity to Minn. St. 268.09, subd. 1(6).

[7]E. g., Ill. Rev. Stat. 1961, c. 48, § 434, which provides: "An individual

which he seeks compensation can be reasonably attributed to any cause other than the labor dispute and its consequent work stoppage at his place of employment. See, Ross v. Review Board of Indiana Employment Sec. Div. (Ind. App.) 172 N. E. (2d) 442, 446. Under the latter it is generally held that the work stoppage, or substantial curtailment, existing at the employer's establishment because of the labor dispute must run simultaneously with continued disqualification from unemployment benefits and that resumption of production to normal levels by hiring replacement workers lifts the bar preventing striking employees from drawing benefits.[8]

In Minnesota, we have the so-called "active progress" type of statute. Benefits will usually be denied during the continued existence of the labor dispute.[9] The disqualification, however, may be removed by certain actions of either the employer or employee, or both, inconsistent with continuance of the employment relationship.[10] The disqualification is lifted when the employee obtains subsequent employment after tender by him and acceptance by the employer involved in the la-

---

shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is *due to a stoppage of work which exists because of a labor dispute * * *.*" (Italics supplied.)

[8]Sakrison v. Pierce, 66 Ariz. 162, 185 P. (2d) 528, 173 A. L. R. 480; Robert S. Abbott Pub. Co. v. Annunzio, 414 Ill. 559, 112 N. E. (2d) 101; Saunders v. Unemployment Comp. Board, 188 Md. 677, 53 A. (2d) 579; Lawrence Baking Co. v. Unemployment Comp. Comm. 308 Mich. 198, 13 N. W. (2d) 260, 154 A. L. R. 660. Cf. Producers Produce Co. v. Industrial Comm. 365 Mo. 996, 291 S. W. (2d) 166; Magner v. Kinney, 141 Neb. 122, 2 N. W. (2d) 689. Contra, Board of Review v. Mid-Continent Petroleum Corp. 193 Okla. 36, 141 P. (2d) 69.

[9]Minn. St. 268.09, subd. 1(6). Disqualification attaches "If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute." In Ayers v. Nichols, 244 Minn. 375, 381, 70 N. W. (2d) 296, 299, we stated obiter dicta: "We need not fix the exact time at which the severance of the relationship takes place for under our present act the employee is disqualified from receiving benefits as long as the strike continues."

[10]See, e. g., Kitchen v. G. R. Herberger's, Inc. 262 Minn. 135, 114 N. W. (2d) 64.

bor dispute of his resignation.[11] Disqualification is also removed when an employer (a) terminates the operation of its business;[12] (b) removes the location of its operation to some unreasonably distant locale from the work force;[13] or (c) unequivocally discharges a striking employee who accedes to such dismissal.[14] If the striking employee does not accept the attempted discharge, the employer's conduct may be insufficient to destroy the status of the worker, in which event the disqualification persists.[15] Action inconsistent with the continuance of the employment relationship may constitute acceptance of discharge. Subsequent negotiations relative to the resumption of employment, maintenance of pickets and continued participation by individual employees in the strike, and an indication of a willingness to return to work when the labor dispute ultimately terminates are significant facts in deciding if the employer-employee relationship has been considered dissolved by the striking employees.

Applying these principles to the facts in the case at hand, can it be said that the employees had been permanently replaced prior to February 19, 1960? Did the announcements by the employer such as the news release of December 9, 1959, advising that "no individual striker

---

[11]Minn. St. 268.09, subd. 1(6), provides in part: "* * * that this disqualification shall not act to deny any individual the right to benefits based on employment subsequent to his separation because of a strike or other labor dispute if such an individual has in writing notified the employer involved in such strike or other labor dispute of his resignation and acceptance of his resignation and acceptance of other bona fide employment and provided further that such resignation is accepted by all parties to the strike or other labor dispute so that such individual is no longer considered an employee of such employer."

[12]Kitchen v. G. R. Herberger's, Inc. supra.

[13]See, Annotation, 13 A. L. R. (2d) 874, 885.

[14]Marathon Elec. Mfg. Corp. v. Industrial Comm. 269 Wis. 394, 69 N. W. (2d) 573, 70 N. W. (2d) 576. Cf. Rice Lake Creamery Co. v. Industrial Comm. 15 Wis. (2d) 177, 112 N. W. (2d) 202; Ruberoid Co. v. California Unemployment Ins. Appeals Bd. 27 Cal. Rptr. 878, 378 P. (2d) 102. See, Thomas v. California Employment Stab. Comm. 39 Cal. (2d) 501, 247 P. (2d) 561.

[15]Thomas v. California Employment Stab. Comm. supra.

has been notified specifically that he is replaced, but this does not alter the fact that each new employee hired replaces a striker in his job"; or the notice of January 25, 1960, to all striking employees that those "who have been permanently replaced, will no longer be eligible for continuance of group life insurance * * * or group hospitalization, medical, and surgical insurance," constitute termination of the employment relationship? The administrative agency found that no individual employee was ever denied reinstatement by the employer throughout the period of the strike. The strikers did not accept the announcements as termination of their employee status. They continued through their union to negotiate a strike settlement. Agreement was ultimately reached. The decision of the department is in accord with the rule that a strike is a temporary stoppage of work only and does not terminate the employment relationship. Ayers v. Nichols, 244 Minn. 375, 70 N. W. (2d) 296. Therefore, the finding that the strikers' employee status had not terminated is not contrary to the evidence.

Aside from the fact that the claimants refused to accept the discharge by the employer, such discharge was *not* the direct and proximate cause of each claimant's unemployment after December 9, 1959, the date of the alleged termination notice. Before that date the employer conducted an active program attempting to induce strikers to return to work without success. On or about November 30, 1959, the company commenced hiring new employees on a large scale. Few of the striking employees accepted the opportunity to return to work at that time although the record shows they were free to do so. Those who did, approximately 25 in number, were not deprived of seniority on basis of their previous employment. Under these circumstances the following explanation in Thomas v. California Employment Stab. Comm. 39 Cal. (2d) 501, 506, 247 P. (2d) 561, 563, for denying compensation is relevant:

"There is no evidence in the record indicating that the termination notices caused claimants to remain out of work * * * or had anything to do with their determination to remain away from their jobs. None of the claimants who appeared as witnesses testified that he would have returned to work if he had not been discharged or that he would

have been willing to cross the picket line. To the contrary, claimants did not respond to two notices given by the company to all employees * * * requesting that they return to work immediately or as soon as strike conditions cease to exist."

In Ruberoid Co. v. California Unemployment Ins. Appeals Bd. 27 Cal. Rptr. 878, 378 P. (2d) 102, it was held that disqualification was removed when (a) striking employees were given notice by their employer to return to work on a certain date or be terminated, (b) the employer then sent individual striking employees "discharge" notices with termination pay, and (c) 15 claimants who then applied for work at the establishment were refused employment. Factors (b) and (c) are not present here.

Other cases cited by claimants are not inconsistent with our decision. Ayers v. Nichols, 244 Minn. 375, 70 N. W. (2d) 296, involved claims under similar circumstances but only for the period *after* the strike had been settled. It was held that where the continued unemployment was the result of an arbitration determination that the striking employees were *not* entitled to reinstatement, the disqualification was removed. In Kitchen v. G. R. Herberger's, Inc. 262 Minn. 135, 114 N. W. (2d) 64, unemployment was held to cease to be a result of a strike or labor dispute after the employer discontinued the operation of his business. In Rice Lake Creamery Co. v. Industrial Comm. 15 Wis. (2d) 177, 112 N. W. (2d) 202, the employer notified the union representing the striking employees that "new hires" permanently displaced the individuals on strike. It was held in denying unemployment benefits that this action of the employer did not amount to discharge. In Marathon Elec. Mfg. Corp. v. Industrial Comm. 269 Wis. 394, 69 N. W. (2d) 573, 70 N. W. (2d) 576, the employer closed the plant doors in what amounted to a lockout. This would have removed the disqualification in Minnesota under the express provision of § 268.09, subd. 1(6), providing, "Nothing in this subsection shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout * * *." Capra v. Carpenter Paper Co. 258 Minn. 456, 104 N. W. (2d) 532. See, also, Kitchen v. G. R. Herberger's, Inc. *supra*.

The decision of the commissioner to the effect that claimants lost their employment on October 29, 1959, because of a strike resulting from a labor dispute at the employer's establishment where they were employed; that the dispute was in progress until February 19, 1960; and that claimants were disqualified for benefits for the duration of such period is, therefore, affirmed.

■ The employer contests the determination by the department that claimants' period of unemployment from February 19, 1960, until reinstatement pursuant to arbitration was compensable and argues that it was involved in a labor dispute either with the striking union or a rival claiming the right to represent the "new hires" during all of the period covered by the compensation claims. There is no Minnesota decision directly in point on this aspect of the case, and we have no guideposts from decisions of courts in other jurisdictions. Minn. St. 268.03 provides that the "public good and the general welfare of the citizens of this state will be promoted by providing * * * unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." The purpose of § 268.09, subd. 1(6), is to make the state neutral between the contending forces during the progress of a labor dispute. The legislative policy underlying the statute is intended to protect employers from being compelled to finance a strike against themselves. This happens when their accounts are charged for payment of unemployment compensation benefits to their employees during the progress of a labor dispute. Kitchen v. G. R. Herberger's, Inc. 262 Minn. 135, 138, 114 N. W. (2d) 64, 66. It does not occur when the strike is settled and the parties agree to be bound by arbitration of unresolved aspects of the controversy. The evidence showed the employees were ready and able to return to work after February 19, 1960. The dispute was ended in so far as the parties were concerned when they agreed to accept the decision of the arbitrators. The public policy against interference in a strike or labor dispute then dissolved and the policy of alleviating hardships resulting from unemployment became applicable. We conclude that the finding that the labor dispute and strike terminated for unemployment compensation purposes on February 19 is supported by the evidence

and that the disqualification provided by § 268.09, subd. 1(6), then ceased.

The employer also contends that where "an employer and his striking employes enter into a collective bargaining agreement which submits to arbitration the question of whether they or new employes hired during the strike shall fill available jobs, and when, as a part of this agreement, the parties agree that the newly hired employes shall remain on the job pending a decision in arbitration, * * * the striking employes [are] voluntarily unemployed within the meaning of M. S. A. 268.09, subd. 1(1)." This contention was answered in Ayers v. Nichols, 244 Minn. 375, 70 N. W. (2d) 296, where it was held that agreement to submit the issue of the right to reinstatement to arbitrators did not create a voluntary unemployment within the meaning of the Unemployment Compensation Act.

Affirmed.