R. E. JOHNSON AND OTHERS v. FORD MOTOR COMPANY.
COMMISSIONER OF MANPOWER
SERVICES, RESPONDENT.

184 N. W. (2d) 786.

March 5, 1971—No. 42134.

*Dorsey, Marquart, Windhorst, West & Halladay, Curtis L. Roy,* and *John Z. Zwakman,* for relator.

*Douglas Hall,* for respondent claimants.

*Douglas M. Head,* Attorney General, *Jerome D. Truhn,* Solicitor General, and *Peter C. Andrews,* Assistant Attorney General, for respondent commissioner.

KELLY, JUSTICE.

Certiorari to review a determination of the commissioner of employment security (now commissioner of manpower services) holding that claimants were not disqualified for unemployment compensation benefits.

On September 6, 1967, virtually all of some 101 plants of the Ford Motor Company (hereinafter Ford), including the Twin Cities plant, were struck by United Automobile, Aerospace and Agricultural Implement Workers of America (hereinafter U. A. W.). A national agreement covering 101 Ford locations was reached on October 22, although at many of the Ford plants local issues remained unsettled. The parties recognized that the national agreement would not settle the strikes on local issues. One of the provisions of the national agreement prohibited strikes and employees continuing to strike on local issues would be in violation of this provision. To resolve this and other problems, section 5 was inserted in the national agreement. Section 5 provided, among other things, that wage increases negotiated in the agreement were to be withheld until the strike was termi-

nated at all locations and that increased benefits, originally to take effect 90 days after the effective date of the new agreement, were to be delayed until 90 days after the termination of all strikes over local issues. These wage increases and increased benefits may be referred to as the fruits of the strike.

In addition, section 5 provided:

"The Company will waive the provisions of the new Collective Bargaining Agreement prohibiting or limiting the right to strike with respect to each plant where the strike continues for the duration of the continuance of the strike at such plant, with the understanding that time lost by employes at other plants in the Contract Unit as a result of such waiver is acknowledged by the parties to be time lost in the strike."

This quoted provision in effect acknowledged that when one plant lost time because of the continued strike at another plant, such time lost was time lost in the strike. We will hereafter refer to this as the "time lost clause."

The national settlement agreement was ratified by the U. A. W. membership on October 25, 1967, and a local agreement between the management of the Twin Cities plant and Local 879 of the U. A. W. was ratified by the local membership on the same date. Although a few employees were called back for the purpose of unloading some railroad cars and working on inventory, resumption of operations at the Twin Cities plant was delayed until November 7, 1967, because of a shortage of parts, apparently resulting from the continued strike at the Monroe, Buffalo, and Cleveland plants. While there seems to be no dispute that the shortage of parts was the reason for the delay in resuming operations at the Twin Cities plant, the commissioner made no specific findings on the cause of the shortage and there is considerable argument and perhaps some "speculation" presented on this issue. We assume here, without deciding, that the cause of the shortage of parts was a continuing strike over local issues at the three aforementioned plants.

Claimants applied for unemployment compensation benefits. Relator claimed they were disqualified, and the case was tried before an appeal tribunal of the Department of Employment Security (now Department of Manpower Services), which held that claimants were entitled to receive benefits from October 28 to November 7, 1967. On appeal, the commissioner adopted and affirmed the findings of fact and decision of the tribunal.

In essence, relator disputes the finding of the commissioner that the Twin Cities plant is a separate establishment within the meaning of Minn. St. 268.09, subd. 1(5), and the finding that there was no strike or labor dispute in progress at the Twin Cities plant after October 25, 1967. In support of the contention that there was a strike or labor dispute at the Twin Cities plant, relator referred to a part of section 5 of the national settlement agreement in effect acknowledging that when one plant lost time because of a continued strike at another plant, that such time lost was time lost in the strike. In order to sustain such contention, relator had to, and does, dispute the finding of the commissioner that such provision if intended to deprive claimants of unemployment benefits would be a waiver of benefits in violation of § 268.17, subd. 1. These three findings of the commissioner as attacked by Ford frame the issues in this case.

Minn. St. 268.09, subd. 1, provides in part that an individual shall be disqualified for benefits:

"(1)   If such individual voluntarily and without good cause attributable to the employer discontinued his employment * * *.

\*   \*   \*   \*   \*

"(5)   If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment in which he is or was employed * * *. For the purpose of this section the term 'labor dispute' shall have the same definition as provided in the Minnesota labor relations act. Nothing in this subdivision shall be deemed to deny benefits to

any employee who becomes unemployed because of a lockout or by dismissal during the period of negotiation in any labor dispute and prior to the commencement of a strike."

The Minnesota Labor Relations Act, Minn. St. 179.01, subd. 7, defines "labor dispute" as follows:

" 'Labor dispute' includes any controversy concerning employment, tenure or conditions or terms of employment or concerning the association or right of representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms, tenure, or other conditions of employment, regardless of whether or not the relationship of employer and employee exists as to the disputants."

Section 179.01, subd. 8, defines "strike" as follows:

" 'Strike' means the temporary stoppage of work by the concerted action of two or more employees as a result of a labor dispute."

The other key statutory provision involved in this case is § 268.17, subd. 1, which provides in part:

"Any agreement by an individual to waive, release, or commute his rights to benefits or any other rights under sections 268.03 to 268.24 shall be void."

In reaching a decision in this case we also bear in mind the statutory and case law on the scope of review, burden of proof, the legislative intent with respect to the disqualification provisions, the purpose of those provisions, and the concept that unemployment compensation should be paid to those unemployed without fault on their part:

(a)   The scope of review by this court of a decision of the commissioner of manpower services was stated in Kantor v. Honeywell, Inc. 286 Minn. 29, 175 N. W. (2d) 188. We there said that if there is evidence reasonably tending to sustain the findings of the commissioner, they will not be disturbed on review.

Moreover, the scope of judicial review as set forth in the Administrative Procedures Act, § 15.0425, would not permit us to reverse or modify a finding or decision of the commissioner unless his finding or decision is unsupported by substantial evidence.

(b) The employer has the burden of proving that the employee is disqualified for unemployment benefits under the disqualification provision of § 268.09. Kantor v. Honeywell, Inc. *supra*.

(c) The legislative intent with respect to the disqualifying provisions of § 268.17 is set forth in Nordling v. Ford Motor Co. 231 Minn. 68, 76, 42 N. W. (2d) 576, 581, 28 A. L. R. (2d) 272, 279, in which this court stated:

"Unemployment compensation statutes were enacted during a period of distress and were designed to relieve the hardship caused by unemployment due to no fault of the employe. * * * It is a general rule that a liberal construction is usually accorded statutes which are regarded by courts as humanitarian or which are grounded on a humane public policy. * * * Where there are disqualifying provisions, the exceptions should be narrowly construed. But these rules of construction do not mean that we are at liberty to put something into the statute which is not there. Our function, guided by ordinary rules of construction, is to ascertain, if we can, what the legislative intent was and to give effect to it."

(d) The purpose of the statute in disqualifying employees from unemployment benefits where employment is lost because of a "strike" or "labor dispute" at the "establishment" where he is or was employed is to make the state neutral between the parties to a labor dispute.[1]

(e) The type of "fault" concept we are concerned with in this case is found in Minn. St. 268.03, which provides in part:

"The legislature, therefore, declares that in its considered

---

[1] Kitchen v. G. R. Herberger's, Inc. 262 Minn. 135, 114 N. W. (2d) 64; Johnson v. Wilson & Co. 266 Minn. 500, 124 N. W. (2d) 496.

judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

With the foregoing statutory provisions and case law in mind, we approach the separate establishment issue, a question which this court also considered in Nordling v. Ford Motor Co. *supra*.[2] In Nordling, Ford's Twin Cities branch, sometimes called the St. Paul plant, was an assembly plant which was forced to close down because of a shortage of parts caused by a wildcat strike of all employees at the Rouge plant located at Dearborn, Michigan. There was no dispute between the union and company relative to operations at the St. Paul plant. Employees at the St. Paul plant filed claims for unemployment benefits and Ford claimed that the employees were disqualified because there was a strike or labor dispute at the establishment where they worked. On review before this court, Ford contended that the entire Ford Motor Company was one establishment, and that when the Rouge plant strike resulted in a shortage of parts which in turn caused a shutdown of the St. Paul plant, the claimants' resulting unemployment was due to a strike or labor dispute at the establishment where they were employed. This court affirmed the administrative finding that the St. Paul plant was a separate establishment at which there was no strike or labor dispute.

Our court, after discussing the decisions of other courts on the establishment issue, stated:

"Rather than distinguish the cases on differing facts, we prefer to place decision on the broader ground that we believe

---

[2] Approved in Koll v. Egekvist Bakeries, Inc. 259 Minn. 287, 107 N. W. (2d) 373; Weiss v. Klein Super Markets, Inc. 259 Minn. 502, 108 N. W. (2d) 4; Graham v. Sanders, 11 Mich. App. 361, 161 N. W. (2d) 601. The Nordling case is considered a leading case and is set forth in full in 28 A. L. R. (2d) 272, preceding an annotation on disqualification for unemployment benefits because of labor disputes or strikes.

that the test of functional integrality, general unity, and physical proximity should not be adopted as an absolute test in all cases of this type. No doubt, these factors are elements that should be taken into consideration in determining the ultimate question of whether a factory, plant, or unit of a larger industry is a separate establishment within the meaning of our employment and security law. * * *

* * * * *

"* * * We believe the better rule to be that these factors, together with other facts, must be taken into consideration in determining whether the unit under consideration is in fact a separate establishment from the standpoint of employment. The St. Paul branch of the Ford Motor Company is highly integrated with other units of the company for purposes of efficient management and operation, but is separate insofar as the employes are concerned for the purpose of employment. The employes are hired and discharged by the St. Paul manager. They are members of a local union which has no connection with the locals at Dearborn, except that all locals are members of the same international, as are many others not connected with the Ford Motor Company. The seniority rights of the employes extend only to operations at the St. Paul plant. No showing has been made, nor do we believe that any can be made, that an employe at the St. Paul branch can 'bump' an employe at the Rouge plant, the Los Angeles plant, the Georgia plant, or anywhere else than at the St. Paul plant. Payment to the Minnesota unemployment compensation fund is made only for employes at the St. Paul plant, and, obviously, benefits can be drawn only by employes in the St. Paul branch from the Minnesota fund. Employment under the act relates to services performed within the state or localized here. The members of Local 879 had nothing to do with calling the strike at the Rouge plant and could do nothing to avert it. While the record does not so show, we assume that under our act the contribution rate of the employer is based on the experience ratio of employes within this state without any regard to the ex-

perience in other states." 231 Minn. 85, 42 N. W. (2d) 586, 28 A. L. R. (2d) 285.

Relator has produced no evidence to show any significant factual differences between Nordling and this case on the issue of establishment. Here, as in Nordling, claimants through nationwide bargaining established the basic terms and conditions of employment but were represented in bargaining on local issues by local unions. As in Nordling, there was no dispute on national or local issues between the unions and Ford at the Twin Cities plant at the time of claimants' application for unemployment benefits. It is argued by relator that the Twin Cities plant was a part of a larger establishment because claimants had a stake in local negotiations at other plants in that by the terms of the 1967 national agreement they were not to receive the "fruits" of the strike until the strike was terminated at all plants. However, the employees here involved and Local 879 had no control over the strike at the Monroe, Buffalo, and Cleveland plants. These disputes might just as well have been wildcat strikes, as in Nordling, or a strike at some independent plant from whom Ford was buying parts. True, the 1967 settlement agreement contained a waiver of the no-strike clause and this permitted the strike to continue at these other plants, but this doesn't mean that claimants or Local 879 could have averted or stopped these other strikes.

There is no showing that this case differs significantly from Nordling with respect to the factors of "functional integrality," "physical proximity," or "general unity." More importantly, no real difference has been shown by relator between Nordling and the instant case from the standpoint of employment. We reject relator's argument that because major labor issues between Ford and U. A. W. were negotiated and resolved on a centralized and national basis, the Twin Cities plant should be a part of a broad establishment that would include the Monroe, Buffalo, and Cleveland plants. Local issues affecting local plants were negotiated by bargaining at the individual plant level by local unions. Settle-

ment of major issues on a national basis was not found to be a controlling factor on the establishment issue in Nordling.[3]

We now consider the second issue presented: Was there a strike or labor dispute in progress at the Twin Cities plant? It is argued by Ford that the employees of the Twin Cities plant had a stake in the strikes at other Ford plants because under section 5 of the 1967 settlement agreement the fruits of the nationwide strike would be delayed for Twin Cities plant employees until all strikes were terminated at all company locations. Relator asserts that this stake constituted a dispute and existed during the period from October 28 to November 7, 1967, at the Twin Cities plant. Claimants no doubt had an interest in the conclusion of the strikes at other plants, but there was no dispute or controversy between Ford and the claimants as it was agreed that the fruits of the strike were to be delayed until strikes were terminated at all Ford plants. When claimants, through agreements negotiated by their national and local unions, were in complete accord with Ford, it is impossible to find that a dispute existed.

---

[3] Relator cites Weiss v. Klein Super Markets, Inc. *supra,* in support of its contention that collective bargaining on national issues should be a major factor in determining the establishment issue. This court in Weiss cited the Nordling case and followed its ruling: "Under the facts and factors here, the individual supermarket cannot be considered a separate establishment from the standpoint of employment under the rule laid down in the Nordling case." 259 Minn. 508, 108 N. W. (2d) 9.

In Nordling, as in the instant case, national negotiations on major issues were handled by Ford and the U. A. W. but agreements were negotiated between the management of individual plants and local unions on local issues. In Weiss, two separate contracts were negotiated covering all issues at 16 stores in St. Paul and 9 stores in Minneapolis. The managers of each store did not negotiate separate contracts on problems affecting individual stores and their employees. Although in Weiss Nordling was distinguished in many other respects from the standpoint of employment, no useful purpose would be served in repeating the distinctions here.

Relator claims that not only did a labor dispute continue after October 25, 1967, at the Twin Cities plant, but the strike continued as well, because of the "time lost" clause contained in section 5 of the national settlement agreement.

It seems obvious that if no strike or labor dispute was in fact in progress at the Twin Cities plant, as found by the commissioner, that an agreement acknowledging that a strike was in progress would be a fiction contrary to the spirit and purpose of the Minnesota Unemployment Security Law and in direct violation of the anti-waiver provision of § 268.17, subd. 1, particularly if a waiver of claimants' rights under the law was the only purpose the fiction served. The appeal tribunal commented on the purpose of this "time lost" clause as follows:

"Furthermore, it appears that Section 5 of the Settlement Agreement was only intended by the negotiating parties to apply to the payment of Supplemental Unemployment Benefits under a contract between the employer and the U. A. W. and not to claimants' rights to unemployment compensation under the law. Section 5 of the Settlement Agreement, therefore, should not apply."

If this was the real purpose of that portion of section 5, namely, the withholding of supplemental unemployment benefits, the agreement could have simply stated that these benefits would be withheld until the strikes were terminated at all company locations rather than attempting to create a fictional strike.

Relator also claimed that the "time lost" provision was important because the U. A. W. by a letter of agreement of September 28, 1967, agreed to pay certain contributions for employees for insurance benefits. This letter of agreement came into existence prior to the national agreement and the same results could have been accomplished by using different language without attempting to create a fictional strike. We cannot find that the "time lost" clause had any real separate significance independent of any effect it had on unemployment benefits where the same re-

sults were obtainable by simply using different words. We do not believe that the anti-waiver provision of § 268.17 should be circumvented by a fiction under the facts here presented. If section 5 here was intended to deprive claimants of their rights to unemployment compensation, then it would violate the "anti-waiver" provision of § 268.17, subd. 1, as found by the commissioner.[4]

Relator asserts that section 5 of the national agreement does not contravene the anti-waiver provision. In support of this assertion, relator cites Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449; Bergseth v. Zinsmaster Baking Co. 252 Minn. 63, 89 N. W. (2d) 172;[5] and Anson v.

---

[4] The New York Court of Appeals in In re George's Claim, 14 N. Y. (2d) 234, 242, 250 N. Y. S. (2d) 421, 426, a case much the same as the instant case, stated: "To summarize, we believe that, where an industrial dispute is in fact settled by agreement within the unit defined by statute as an establishment, the policy of the statute is called into play notwithstanding the national agreement's characterization of the continued work stoppage as 'an authorized strike'. The stoppage is in fact due to disputes at other establishments, and labels notwithstanding, that sort of reason for unemployment is not regarded by our law as a sufficient cause for denying benefits."

The Supreme Court of Michigan in General Motors Corp. v. Employment Security Comm. 378 Mich. 110, 142 N. W. (2d) 686, held that a similar anti-waiver provision, if given the effect sought by relator here, would violate the Michigan Unemployment Security Act.

[5] In Bergseth v. Zinsmaster Baking Co. 252 Minn. 63, 89 N. W. (2d) 172, it was held that claimants who were retired under a compulsory retirement provision of a pension program which was part of a collective bargaining agreement between the employer and claimants' union left voluntarily and without good cause attributable to their employer under Minn. St. 268.09, subd. 1, and hence were not entitled to unemployment benefits. The court in Bergseth discussed Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449, and stated: "There, unemployment benefits were denied to a union member who was not entitled to vacation pay when his employer's plant was closed down pursuant to a contract with his union because

Fisher Amusement Corp. 254 Minn. 93, 93 N. W. (2d) 815.[6]

In all three cases, this court determined that the claimants voluntarily and without good cause attributable to the employer discontinued their employment under § 268.09, subd. 1, when they had agreed in collective bargaining agreements represented by their unions to certain "conditions of employment" resulting in unemployment.[7]

---

of a lack of the necessary length of service. We held that the claimant's unemployment during that period was voluntary in view of the existence of the union contract. The principles enunciated in the Jackson case apply even more forcefully in the instant case. Unemployment compensation is designed as a cushion against the vagaries of sporadic losses of work for employees who are genuinely attached to the labor market and who fully expect to return. Retirement benefits, on the other hand, look to a withdrawal from the labor market and more nearly approximate a reward for past services." 252 Minn. 70, 89 N. W. (2d) 177.

[6] In Anson v. Fisher Amusement Corp. 254 Minn. 93, 101, 93 N. W. (2d) 815, 821, the court held: "* * * [W]hen a nonmember of a union local knowingly accepts—or continues—employment with an employer who is subject to the seniority provisions of a collective-bargaining agreement with the union local, he thereby ratifies and accepts the terms of the contract, and, subject to those terms, he constitutes the union his bargaining agent, and its acts are his acts; and when, upon request of the local's business agent, he resigns his employment so that a member of the local may claim his job, his act of resignation is voluntary and without good cause attributable to the employer under § 268.09, subd. 1(1)."

[7] In Bergseth v. Zinsmaster Baking Co. supra, in reference to a number of situations in which various courts have held that employees became unemployed voluntarily and without good cause attributable to the employer and were therefore not entitled to unemployment benefits, this court stated: "When, for one reason or another, an employer is required to dismiss his employee pursuant to the collective-bargaining agreement, questions regarding the voluntary or involuntary nature of the separation arise. By and large, if the contract contains reasonable provisions encompassing appropriate subjects for collective bargaining and is properly negotiated by the authorized agent and properly ratified by the union membership, it will be deemed to be the

We must in this case give some meaning to the "voluntary and without good cause" provision and at the same time give some meaning to the "anti-waiver" provision of our statutes. Determination of future controversies involving a conflict between these two provisions will have to depend on the facts in each case and it would be of no great service to anyone to generalize. In the instant case, however, it is not enough to say that section 5 of the national agreement had separate significance independent of any effect it had on unemployment compensation. It is only

---

voluntary act of each individual member of the union, including any dissenters. The ratification forecloses any subsequent claim by an employee that actions which are incumbent upon him under the terms of the contract are involuntary and against his will. Under this rationale, dismissals for the following reasons have been held to be voluntary and without good cause attributable to the employer so that unemployment benefits were not available: (1) Refusal to join a labor organization with which the employer had a closed- or union-shop agreement; (2) refusal to pay union dues and thus remain in good standing with the union as required under the contract; (3) refusal to retain union membership as required under the contract; (4) marriage, after which the contract requires a discharge; (5) pregnancy, at which time the contract requires a discharge; (6) refusal of a transfer or a downgrading which involves a lower pay scale or less favorable hours but permits retention of seniority, as provided for by a contract; (7) refusal to abide by a union-management reinstatement agreement; (8) refusal to pay a fine levied by the union; and (9) refusal to comply with union rules. *These separations were without good cause attributable to the employer because they resulted from circumstances about which the employer could do nothing and which were solely within the control of the employee.* The separations were voluntary because they resulted from the acts of duly selected bargaining agents. 'Their acts were his [the employee's] acts.' " (Italics supplied.) 252 Minn. 66, 89 N. W. (2d) 174.

The three cases relied on by relator and the situations described in Bergseth are readily distinguishable from the instant case. Here, the applicants had no control over the circumstances which caused the shortage of parts. The employees and local unions at the three plants (Monroe, Buffalo, and Cleveland) and the relator were the only ones that could settle the strikes causing the shortage of parts.

the "time lost" clause in section 5 that we must examine to see if it had any real separate significance independent of any effect it had on unemployment compensation. As previously pointed out, if that clause was included for some purpose unrelated to unemployment compensation, it was unnecessary to use language which would create an artificial strike. We cannot say that the "time lost" clause had any real separate significance nor did it tie into any conditions-of-employment situation similar to those listed in the Bergseth case.[8]

Because there was no strike or labor dispute at the establishment where the claimants worked during the period for which unemployment benefits are sought, the maintenance of neutrality by the state is not at issue. Likewise, because it has not been proved that the claimants were unemployed through some fault of their own, the fault concept does not bar them from benefits. Under the facts and circumstances of this case, looked at in the light of the holdings of this court that the provision for unemployment benefits should be construed liberally, that the exceptions or disqualifying provisions of the statute should be construed narrowly, and that the burden of proof in establishing that claimants are disqualified is on the employer, we hold that there is evidence reasonably tending to sustain the findings and decision of the commissioner and we cannot find, in view of the entire record, that his findings and decision are unsupported by substantial evidence.

Affirmed.

---

[8] See footnote 7, *supra.*