**Kathleen A. OMAN, Relator,**

v.

**DAIG CORPORATION, Department of Economic Security, Respondents.**

No. CX–85–798.

Court of Appeals of Minnesota.

Oct. 15, 1985.

Scott W. Lofthus, Wayzata, for relator.

Daniel J. Starks, Gen. Counsel, Daig Corp., Minnetonka, for Daig Corp.

Hubert H. Humphrey, III, Atty. Gen., Peter C. Andrews, Asst. Atty. Gen., St. Paul, for Dept. of Economic Security.

Heard, considered and decided by HUSPENI, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Relator appeals from the Commissioner of Economic Security representative's decision that respondent discharged relator for misconduct under Minn.Stat. § 268.09 subd. 1(2) (1984), thereby disqualifying relator from eligibility for unemployment benefits. The Commissioner's representative reversed a referee's determination that relator's confrontation with a co-worker was an isolated hotheaded incident that did not rise to a level that constituted misconduct. We reverse.

## FACTS

For two years prior to October 1984, relator Kathleen Oman worked for respondent Daig Corporation as an assembler of pacemaker leads. Relator worked in a "clean room" with a filtering system to eliminate dust and bacteria. Employees working in the clean room were required to wear surgical caps held in place by elastic bands around the edges.

The regular hours for the morning shift at Daig were from 7:00 a.m. to 3:30 p.m., but employees were allowed to begin work before 7:00 a.m. if they wished, and they received overtime pay if they worked extra hours. Relator was in a carpool which arrived at 6:15 a.m. While the two other members of her carpool would first drink coffee together before beginning work, relator, who was not a coffee drinker, generally took advantage of the opportunity to earn additional overtime pay and would begin work immediately. She would work alone in the clean room until 6:30 a.m., when some other employees would also begin working.

On October 14, 1984, one of relator's co-workers, who was also in her carpool, heard that respondent intended to discontinue overtime due to some concern about employees working alone in the clean room. At approximately 6:30 a.m. the co-worker began to harass relator about her habit of starting work before everyone else, claim-

ing she was ruining overtime for everyone. The co-worker told relator that, at the 9:00 a.m. break, their supervisor was going to announce that no more voluntary overtime would be permitted. Worried that the other workers would indeed blame her for the loss of overtime, relator spoke to the supervisor before the break, but he did nothing to alleviate her concern, saying there was nothing he could do.

At 9:00 a.m., the third member of the carpool told relator that she would no longer give her rides to work. This distressed relator even more, as she was dependent on the carpool to get to work. She is an epileptic and does not drive. Because she was upset and nervous about the loss of her transportation to work and about the other employees' attitude towards her, relator did not join the others for the break but instead went to sit by herself in another room. During the break, the supervisor told the other employees that they would no longer be allowed to start work before 7:00 a.m.

Relator returned to work after the break and the co-worker renewed her harassment of her. She also told relator that she would no longer be allowed in the carpool. In an attempt to drown out the co-worker's complaints towards her, relator turned up the volume of a radio, but the co-worker turned it down again and continued her verbal abuse. This happened several times until the co-worker finally unplugged the radio and moved it out of relator's reach. Relator finally lost her temper and threw a small plastic object at the co-worker. She then went over to where the co-worker was seated, pushed her chair back into a corner, and pulled off the co-worker's surgical cap. The other workers in the room then moved towards the two to intervene, but relator was already walking away. Relator then apologized to the co-worker for losing her temper, and everyone was able to return to work and complete the shift without further incident. The actual physical confrontation had lasted only a few moments. The co-worker's only injury was a small red mark on her forehead where relator had grabbed her cap, and the mark disappeared before the end of the workday. No equipment or product in the clean room was damaged or contaminated as a result of the altercation. At the end of the day, the supervisor terminated relator for fighting.

## ISSUE

Did relator's actions constitute misconduct, disqualifying her from eligibility for unemployment compensation?

## ANALYSIS

■ Under Minnesota's economic security laws, an employee discharged for misconduct is disqualified from receiving unemployment compensation benefits. Minn. Stat. § 268.09 subd. 1(2) (1984). Because this statute is remedial in nature, it must be liberally construed. Provisions that operate to disqualify employees, such as the misconduct provision of subdivision 1(2), must therefore be narrowly construed. *Smith v. Employers' Overload Co.*, 314 N.W.2d 220, 222 (Minn.1981); *Evenson v. Omnetic's*, 344 N.W.2d 881, 882–83 (Minn. Ct.App.1984). Moreover, the employer bears the burden of proving misconduct. *Lumpkin v. North Central Airlines, Inc.*, 296 Minn. 456, 459–60, 209 N.W.2d 397, 400 (Minn.1973).

■ In reviewing unemployment compensation cases, this court considers the findings of the Commissioner of Economic Security in the light most favorable to the decision and will not disturb the findings if there is evidence reasonably tending to sustain them. *White v. Metropolitan Medical Center*, 332 N.W.2d 25, 26 (Minn.1983). The scope of review is limited to a consideration of:

> [W]hether the department kept within the jurisdiction; whether it proceeded on an erroneous theory of law; whether its action was so arbitrary and unreasonable that it represents its will and not its judgment; or whether the decision of the department is without evidence to support it.

*Johnson v. Wilson & Co.*, 266 Minn. 500, 507, 124 N.W.2d 496, 501 (Minn.1963);

*Evenson,* 344 N.W.2d at 882; *King v. Little Italy,* 341 N.W.2d 896, 898 (Minn.Ct. App.1984).

The Minnesota Supreme Court defined misconduct as follows:

> "[T]he intended meaning of the term 'misconduct' * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has a right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as a result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' * * *."

*Tilseth v. Midwest Lumber Co.,* 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973) (quoting *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 259, 296 N.W. 636, 640 (1941)).

Applying the *Tilseth* standard, the supreme court has also held that "an isolated hotheaded incident which does not interfere with the employer's business is not misconduct * * * justifying a denial of unemployment compensation benefits." *Windsperger v. Broadway Liquor Outlet,* 346 N.W.2d 142, 145 (Minn.1984). The court in *Windsperger* cited several cases from other jurisdictions that also apply the "single hotheaded incident" rule. For example, the supreme court of Idaho held that:

> While an employer has a right to expect that his employees will not engage in protracted argument after an order or directive is given to an employee, yet he cannot expect that his employees will at all times be absolutely docile or servile.
>
> \* \* \* \* \* \*
>
> * * * The law does not set such a standard. A single incident of compara-

tively nonserious disrespect by complaining and arguing is not misconduct.

*Windsperger,* 346 N.W.2d at 144 (quoting *Avery v. B & B Rental Toilets,* 97 Idaho 611, 614–15, 549 P.2d 270, 273–74 (1976)).

The facts in the present case are consistent with the isolated hotheaded incident situations that require the application of the *Windsperger* rule. Relator had worked for respondent without incident for two years before her confrontation with the co-worker who blamed her for a change in company policy. After the co-worker first harassed relator that morning, relator attempted to avoid further confrontations with her accuser by discussing the problem with the supervisor. The supervisor, however, reacted to her concern with indifference. Relator was especially disturbed because her co-worker's unfair accusations also resulted in the loss of her transportation to work. Nevertheless, relator continued to try to avoid her co-worker's anger by staying by herself during the employee break and by turning up the volume of the radio in the clean room so she could not hear the co-worker's comments.

When all of her attempts failed and the co-worker persisted in her abusive treatment, relator briefly lost her temper and released her anger on the co-worker. Her most egregious act was to push the co-worker back in her chair, and to pull off her work cap, which temporarily left a mark on the co-worker's forehead. Relator immediately regained control of herself and apologized for her actions. The case is one of pride and self respect being injured past the point where reason and discretion control. While an employer has the right to discharge an employee for such behavior, the issue here "is not whether [relator] should have been terminated, but whether, now that she is unemployed, she should be denied unemployment compensation benefits as well." *Windsperger,* 346 N.W.2d at 143.

Relator's conduct "does not evince such a willful disregard for her employer's interests as to justify denying her unemploy-

ment benefits * * *." *Id.* at 145. There is no evidence indicating that the employer's business was disturbed, as the Commissioner's findings indicate that both women completed the day's shift and that no other dispute arose between them. To the contrary, relator's early attempts to avoid the entire conflict by discussing it with the supervisor show her interest in maintaining peace in the workplace and in protecting the employer's interests.

█ This court has held that where "the supervisor was partly responsible for the outburst occurring where it did," *Windsperger* controls. *Mankato Lutheran Home v. Miller,* 358 N.W.2d 96 (Minn.Ct. App.1984), *pet. for rev. denied* (Minn. Feb. 6, 1985). In that case, a nursing assistant was discharged for misconduct after she yelled at her supervisor in front of two nursing home residents. This court found no misconduct because the supervisor knew that the employee had been feeling ill all day, but nevertheless would not allow her to go home, and the supervisor, in the presence of the two residents, began the conversation that ended in the employee's outburst. Just as in this case, the record in *Mankato Lutheran Home* showed that the employee's "illness and frustration had increased over several hours until she exploded emotionally." *Mankato Lutheran Home,* 358 N.W.2d at 99. The supervisor in the present case was not the person who provoked relator's outburst. Nevertheless, the supervisor's reluctance to intervene was a factor in the incident occurring when and where it did.

Respondent contends this case does not fall under *Windsperger* because "the hot-headed incident exception has never been applied to a physical confrontation." *Tester v. Jefferson Lines,* 358 N.W.2d 143, 145 (Minn.Ct.App.1984). The *Tester* case relied on a decision where this court distinguished the facts before it from those in *Windsperger* because *Windsperger* "involved verbal outbursts rather than physical confrontations." *Hines v. Sheraton Ritz Hotel,* 349 N.W.2d 329, 330 (Minn.Ct.App.1984). *Hines* involved a physical assault that fol-

lowed a long-standing antagonism between two co-workers. The assault was much more serious than that inflicted here by relator upon her co-worker. In *Tester,* the relator acted deliberately and without provocation. Because of important factual differences between these cases and this one, we cannot accept respondent's argument.

In *Hines,* there was a history of bad feelings between two employees of the Sheraton Ritz Hotel. Hines resented the other employee, because he had been promoted to head housekeeper even though Hines had more seniority. Both employees were discharged for misconduct following a scuffle that began in an elevator and involved "grabbing, pushing and shouting." *Id.* at 329. Other employees had to physically separate Hines and her opponent. Hines threatened the other employee, saying she and her two sons would "get" him. Hines, when she was hired by the hotel, had signed a statement that she had received and read the employee handbook, which expressly prohibited fighting and wrestling. *Id.* at 330.

The discharged employee in *Tester* was a mechanic for Jefferson Lines and had gone to the Greyhound bus terminal to support a bus driver strike by Greyhound union employees. While there, Tester saw two supervisors from Jefferson Lines who had driven some Jefferson buses across the Greyhound employees' picket line. The supervisors were driving because the Jefferson bus drivers were honoring the Greyhound strike. Tester yelled some profanity at the supervisor named Koerber, and when both men recognized Tester's voice and turned around, Tester said: "Yes, Koerber, I'm talking to you." *Tester,* 358 N.W.2d at 144. Later that same day, Tester stood in front of the bus that Koerber was attempting to drive out of the Greyhound terminal, and a police officer had to push Tester out of the way before Koerber was able to exit. *Id.*

Given the differences between the facts of the present case and those of *Tester* and *Hines,* the evidence does not sustain a finding of misconduct. The facts are within

the scope of *Windsperger's* isolated hot-headed incident rule. The court in *Tester* recognized that *Windsperger* did not apply because of the deliberate and intentional nature of Tester's actions, and did not rely on the physical/verbal distinction in reaching its holding.

The court in *Hines* noted such a distinction, but we confirmed there that the overriding test to be applied in misconduct cases is the *Tilseth* definition of misconduct. *Hines*, 349 N.W.2d at 330. There is no evidence that relator's conduct towards her co-worker evinced a wilful or wanton disregard of her employer's interests, was careless or negligent to such a degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or showed an intentional and substantial disregard of the employer's interests or of her own duties and obligations to the employer. Rather, her conduct constituted unsatisfactory conduct, inadvertency or ordinary negligence in an isolated instance, or a good-faith error in judgment or discretion, which is "not to be deemed 'misconduct.'." *Tilseth*, 295 Minn. at 375, 204 N.W.2d at 646.

We are compelled to conclude that the evidence here does not support a finding that relator's isolated confrontation with her co-worker was misconduct within the meaning of Minn.Stat. § 268.09 subd. 1(2) (1984).

### DECISION

The Commissioner's representative erred in concluding that relator's acts constituted misconduct.

Reversed.